271 N.J. Super. 522 (1994)
638 A.2d 1365
JOHN ANZALONE, PLAINTIFF-APPELLANT,
v.
WESTECH GEAR CORPORATION, FORMERLY KNOWN AS OR AS SUCCESSOR TO WESTERN GEAR CORPORATION, DEFENDANT-RESPONDENT, AND "JOHN DOE" (A FICTITIOUS NAME); "JOHN SMITH" INSTALLATION COMPANY, (A FICTITIOUS NAME), DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 22, 1994.
Decided March 25, 1994.
*524 Before Judges PETRELLA, CONLEY and VILLANUEVA.[1]
Maurice H. Connelly argued the cause for appellant (Mr. Connelly, on the brief).
Thomas T. Chappell argued the cause for respondent (Robyn K. Johnson, on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
Plaintiff John Anzalone appeals from a summary judgment order dismissing his complaint against defendant WesTech Gear Corporation (WesTech), formerly known as Western Gear Corporation. Anzalone asserts that the motion judge erroneously (1) applied the government contractor defense, and (2) determined that WesTech did not have either a contractually imposed or common law duty to install the ram tensioner or inspect its positioning aboard ship. We reverse solely on the basis of a misapplication of the government contractor defense.
During 1987, Anzalone, a civilian, worked for the U.S. Navy as a room steward aboard a naval tanker used for transporting fuel and supplies to vessels at sea. He apparently also had limited duties with respect to fuel replenishment operations undertaken by the tanker.
Transferring fuel and supplies between naval ships at sea involves an elaborate replenishment system consisting of numerous components, including a WesTech device known as a "ram tensioner." During a typical replenishment operation, a wire rope known as a "spanwire" or "highline" extends from the delivering ship to the receiving ship to provide support for connecting fuel and supply lines. The spanwire is reeved through a ram tensioner, which contains a series of pulleys at both ends of a vertical *525 column (collectively termed the upper and lower sheave block or assembly). It is operated by a hydraulic ram to maintain constant tension on the spanwire by either "paying out" or "taking in" the spanwire so as to prevent supply lines from falling into the water.
On March 20, 1987, Anzalone (a Bayonne, New Jersey resident) was on the USNS Waccamaw off the Virginia coast,[2] and was on a fuel replenishment detail when he tripped while he was walking adjacent to the open and unguarded lower sheave block. As he fell forward, Anzalone reached out with his left hand and grabbed one of the spanwires as it was being fed vertically downward from the upper sheave assembly into the lower sheave block of the ram tensioner. As a result of the spanwire passing through the lower sheave block, Anzalone's left hand was amputated at mid-palm.
According to the certification of A. Martin Hanke, a Navy engineer from 1941 to 1973, who originated the concept of the ram tensioner, the Navy awarded the first contract for design and development to Sancor Corporation in 1958. On August 7, 1961, after testing and evaluating the Sancor ram tensioner at sea, the Navy drafted specification SHIPS-T-3945, which provided in pertinent part:
3.2.6 Sheaves.  Sheaves shall be designed for one inch wire rope (breaking strength of 85,600 pounds). Means shall be provided to prevent the wire rope from jumping the sheaves.
* * * * * * * *
3.13 Workmanship.  Workmanship shall be of the highest quality commensurate with the intended use.
Additionally, Navy specifications provided in part:
The Contractor shall furnish the services of a competent engineer(s) for checking and placing the hydraulic ram tensioners in a satisfactory operating condition. These services shall consist of assisting the yard in operating and testing the equipment and instructing yard and ship personnel in proper operation of the equipment. Due to the special nature of equipment involved these services are considered essential and special attention is invited to this requirement.

*526 The engineering services shall be performed within the limits as to places, if any, and period specified therefor, at specific places and times which shall be designated by the Chief, Bureau of Ships, Code 622A, or his duly authorized representative.
* * * * * * * *
The Government may require less than the total amount of services set forth above be furnished. In such event or in the event that the Government does not designate times and places sufficient for the full performance of said total amount of services within the period provided therefor, those services not furnished shall be deemed to be terminated for the convenience of the Government at no cost to the Government.
Based upon specification SHIPS-T-3945 and the final Sancor drawings, the Navy issued a procurement request that sought proposals for the development, manufacture, and testing of seventy-eight hydraulic ram tensioners.[3] The Navy subsequently awarded WesTech, then known as Western Gear, the contract to manufacture the ram tensioners.
According to a certification of Charles S. Forve, employed by WesTech since 1966 and currently manager of contracts and special products, a subcontractor for WesTech provided the Navy with the subject ram tensioner in either late 1963 or early 1964. Forve further stated:
All of the ram tensioners provided to the Navy or Naval suppliers by Western Gear/WesTech were manufactured in accordance with strict written military specifications. During my tenure at Western Gear/WesTech, the Navy never objected to any of the ram tensioners on the basis of nonconformity with military specifications. The military specifications for ram tensioners have never required guards for the lower sheave block of the ram tensioner.
Although stating that the SHIPS-T-3945 specification and Sancor drawings "establish[ed] a pattern of detail and precision," Hanke also stated that the initial procurement for ram tensioners "did not require any guarding of the lower sheave block area." With respect to the upper and lower sheave blocks, Hanke further opined:

*527 In my experience at the Navy, its approval of drawings and proposals was never merely a stamp of approval without substantive evaluation; the Navy was always intimately involved with the design and development of all deck equipment and the design and development of the ram tensioner was no exception.
* * * * * * * *
During my tenure with the Navy, guards for the lower sheave blocks of ram tensioners were never required by the specifications or the accompanying drawings in a procurement of ram tensioners.
According to Hanke, WesTech had suggested various design features for the ram tensioner that the Navy had challenged, modified, or rejected. As to the installation of the ram tensioners, Hanke said:
The specifications provided to Western Gear for the production of ram tensioners often contained provisions which stated that the manufacturer was to provide engineering services in connection with the supply of the equipment. Such engineering services were performed only at the request of the Navy and Western Gear had no obligation to provide them unless the Navy requested and paid for those services under the option provided in the contract. Engineering services did not include installation, erection or arrangement of the ram tensioner. Installation and arrangement of the ram tensioner was the sole responsibility of the Navy and the ship builder; Western Gear had no authority to install the ram tensioners it provided and had absolutely no input as to the placement of a ram tensioner within [a replenishment] configuration.
In sum, Hanke believed that the "ram tensioner was a piece of U.S. Navy deck machinery, conceived and developed by the Navy at Navy expense, and its design and application on U.S. Navy ships was completely controlled by the U.S. Navy."
Additionally, R.T. Hawley, who worked at WesTech from 1939 to 1979, and was chief engineer primarily responsible for the development and manufacture of ram tensioners for installation on naval ships, outlined the various military specifications for the ram tensioner in his certification and added:
The specifications further provide that the ram tensioner should reflect the utmost in simplicity and reliability, and that the ram tensioners should be easy to install and maintain with a minimum of skilled personnel.
The specifications clearly provide that the ram tensioner subject to development was to be free standing, base mounted structure which could be placed anywhere upon a ship's deck.
* * * * * * * *

*528 [T]he specifications stated only that some means should be provided to prevent the wire rope from jumping the sheaves, and made no mention of guards for the ram tensioner or the lower sheave block in particular.
* * * * * * * *
The installation of ram tensioners and the positioning of ram tensioners within the fuel replenishment system was done by the Navy with absolutely no involvement on the part of Western Gear.
Although we conclude that summary judgment was improperly granted, we agree with the motion judge that no genuine issues of material fact exist. There is no dispute that (1) WesTech had designed and manufactured the ram tensioner, in conjunction with Navy engineers and specifications; (2) the Navy had approved and accepted the ram tensioner; (3) the ram tensioner, as supplied to the Navy by WesTech, had no safety warnings or devices protecting the lower sheave assembly (the Navy specifications neither expressly prohibited nor required such warnings or devices); and (4) for purposes of the summary judgment motion, and consequently this appeal, it may be assumed that WesTech did in fact negligently design the ram tensioner in question.
Our analysis begins with Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), a 5-4 decision wherein the United States Supreme Court addressed when a contractor providing military equipment to the federal government could be held liable under state tort law for an injury caused by a design defect. Boyle, a marine copilot, was killed when the helicopter in which he was flying crashed off the coast of Virginia. Although Boyle survived the crash, he subsequently drowned because he was unable to escape from the helicopter. His father brought suit against United Technologies Corporation, which built the helicopter, asserting that it had defectively designed the copilot's emergency escape hatch because it opened outward instead of inward and, as such, was ineffective in a submerged craft due to water pressure.
Justice Scalia, writing for the Court, recognized that the suit implicated the "uniquely federal" interest involved in the procurement of equipment by the federal government, even though the *529 dispute was one between private parties, id. at 505-506, 108 S.Ct. at 2514-2515, because "imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected." Id. at 507, 108 S.Ct. at 2515-2516.
Justice Scalia added, however, that the presence of a uniquely federal interest did not end the inquiry, rather it merely established a necessary, not a sufficient, condition for the displacement of state law that:
will occur only where, as we have variously described, a "significant conflict" exists between an identifiable "federal policy or interest and the [operation] of state law" or the application of state law would "frustrate specific objectives" of federal legislation. [Ibid. (citations omitted).]
The majority opinion distinguished Miree v. DeKalb County, 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), where the Court had refused to displace state law in a suit brought by certain private parties as third-party beneficiaries to an agreement between a municipality and the Federal Aviation Administration, reasoning that the suit brought there did not seek to impose upon the person contracting with the government a duty contrary to the duty imposed by the government contract. Rather, it was the contractual duty itself that the third-party beneficiaries attempted to enforce, with any federal interest in the outcome being far too remote and speculative to justify the application of federal law.
In dicta, Justice Scalia discussed an intermediate situation where state law might apply:
Between Miree and the present case, it is easy to conceive of an intermediate situation, in which the duty sought to be imposed on the contractor is not identical to one assumed under the contract, but is also not contrary to any assumed. If, for example, the United States contracts for the purchase and installation of an air-conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. *530 No one suggests that state law would generally be pre-empted in this context. [Id. 487 U.S. at 508-509, 108 S.Ct. at 2516-2517.]
With respect to the helicopter specifications involved in Boyle, he reasoned:
Here the state-imposed duty of care that is the asserted basis of the contractor's liability (specifically, the duty to equip helicopters with the sort of escape-hatch mechanism petitioner [Boyle] claims was necessary) is precisely contrary to the duty imposed by the Government contract (the duty to manufacture and deliver helicopters with the sort of escape-hatch mechanism shown by the specifications). [Id. at 509, 108 S.Ct. at 2517.]
Justice Scalia stated, however, that it would be unreasonable to say that there is always a "significant conflict" between the state law and a federal policy or interest, even in this sort of situation, providing the following example:
If ... a federal procurement officer orders, by model number, a quantity of stock helicopters that happen to be equipped with escape hatches opening outward, it is impossible to say that the Government has a significant interest in that particular feature. That would he scarcely more reasonable than saying that a private individual who orders such a craft by model number cannot sue for the manufacturer's negligence because he got precisely what he ordered. [Ibid.]
Boyle then interpreted certain provisions in the Federal Tort Claims Act (FTCA) in an attempt to identify situations in which a "significant conflict" between federal interests and state law exists in the context of government procurement. Id. at 511, 108 S.Ct. at 2518. Specifically, Boyle relied upon 28 U.S.C.A. § 1346(b), which provides in pertinent part:
[T]he district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
The Court pointed out an exception to this general principle in 28 U.S.C.A. § 2680(a):
Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
Based upon these statutory provisions, Justice Scalia reasoned:

*531 We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting "second-guessing" of these judgments ... through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs. To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production. In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a "significant conflict" with federal policy and must be displaced. [Boyle 487 U.S. at 511-512, 108 S.Ct. at 2518.]
Against this backdrop, Boyle set forth a three-prong test to determine the scope of displacement in design defect cases:
Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. [Id. at 512, 108 S.Ct. at 2518.]
The reasons for these conditions were set forth:
The first two of these conditions assure that the suit is within the area where the policy of the "discretionary function" would be frustrated  i.e., they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability. We adopt this provision lest our effort to protect discretionary functions perversely impede them by cutting off information highly relevant to the discretionary decision. [Id. at 512-513, 108 S.Ct. at 2518-2519.]
Here, WesTech argues that the government contractor defense bars recovery because it had conformed with reasonably precise specifications for the equipment, which the military had reviewed and approved.
Anzalone counters that the government contractor defense does not apply because installation of a safety device or warning with *532 respect to the lower sheave assembly would not have been precisely contrary to or prohibited by an affirmative military specification. He relies on In re Joint Eastern and Southern District New York Asbestos Litigation, 897 F.2d 626 (2d Cir.1990), where three persons and a survivor of a fourth, who had worked at a Navy shipyard during World War II, brought a failure-to-warn cause of action against the manufacturer-supplier who furnished the Navy with an asbestos-based cement according to "fairly precise design and testing specifications, with the most important such specification mandating that the product contain a substantial concentration of asbestos." Id. at 627. The Navy also issued instructions pertaining to the product's packaging, packing, and labeling.
The Second Circuit initially determined that Boyle applied not only to design defect suits, but also to failure-to-warn claims. See Niemann v. McDonnell Douglas Corp., 721 F. Supp. 1019, 1024-1025 (S.D.Ill. 1989); Nicholson v. United Technologies Corp., 697 F. Supp. 598, 604 (D.Conn. 1988). But cf. Harduvel v. General Dynamics Corp. 878 F.2d 1311, 1317 (11th Cir.1989) (Boyle, by its terms, applies only to defects in design), cert. denied, 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990).
In considering under what circumstances Boyle required displacement of a state law duty to warn, the Second Circuit in Asbestos Litigation reasoned:
We agree with the district court that for [appellant] to establish that Boyle displaces any state law duty to warn, [appellant] must show that the applicable federal contract includes warning requirements that significantly conflict with those that might be imposed by state law. Moreover, it seems clear to us that Boyle's requirement of government approval of "reasonably precise specifications" mandates that the federal duties be imposed upon the contractor. The contractor must show that whatever warnings accompanied a product resulted from a determination of a government official, see Boyle [487 U.S. at 512], 108 S.Ct. at 2518 ("feature in question [must be] considered by a Government officer, and not merely by the contractor itself"), and thus that the Government itself "dictated" the content of the warnings meant to accompany the product. See Nicholson, 697 F. Supp. at 604. Put differently, under Boyle, for the military contractor defense to apply, government officials ultimately must remain the agents of decision. [Id. at 630.]
*533 The court rejected the manufacturer's assertion that the government made a discretionary decision not to warn persons in the position of ship workers of the dangers they faced from coming in contact with asbestos:
[Appellant], however, omits a crucial distinction between the discretionary function exception and the military contractor defense. Stripped to its essentials, the military contractor's defense under Boyle is to claim, "The Government made me do it." Boyle displaces state law only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion. [Id. at 632.]
Ultimately, although "not impressed" with the manufacturer's arguments opposing summary judgment, the court remanded for reconsideration of "whether the various Navy packaging, packing, and labeling requirements appearing in the record or the various editions of the Navy Shipment Marking Handbook establish a genuine issue of material fact that the Government might have precluded [appellant] from including any product warnings with the goods alleged to have injured the [appellees]." Id. at 637.
In Dorse v. Armstrong World Industries, Inc., 716 F. Supp. 589 (S.D.Fla. 1989), aff'd o.b., 898 F.2d 1487 (11th Cir.1990), plaintiff brought a failure-to-warn cause of action in an asbestos case against a contractor. There, the Florida District Court distinguished between failure-to-warn and design defect suits, by stating:
On the one hand, the court agrees with the defendant that Boyle is not strictly limited to design defect cases. The government contractor defense, for example, could arise when the government prohibits a specific warning. On the other hand, the court agrees with plaintiff that the three-part test of [Boyle] is necessarily limited to design defect cases. [Id. at 590.]
In order to resolve the "dilemma" of applying Boyle to a failure-to-warn cause of action, the court adopted its own two-prong test, and found that, despite the presence of a uniquely federal interest, there was no conflict "between the state tort duty and the federal contractual duty." Id. at 591.
Here, both Asbestos Litigation and Dorse support the proposition that to displace state tort law, WesTech must show that the *534 government imposed certain contractual obligations upon it that had contravened or significantly conflicted with the operation of state law.
WesTech argues that these cases are distinguishable because their focus is the application of Boyle to claims based upon a state law duty to warn as opposed to state law concerning design defects. We disagree.
As stated in Judge Minor's concurring opinion in Asbestos Litigation:
In an effort to distance the case at bar from Boyle, the majority notes a "contrast" between the design defect theory put forward by the plaintiff in Boyle and the "alleged failure to warn, a separate tort theory," ante at 629, put forward by the plaintiffs here. The distinction is hardly so sharp as to be called a "contrast," however. Defects in product manufacturing and design and failure to warn of product hazards are all of a piece under the general rubric of strict products liability. See generally W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on Torts § 99, at 695-98 (5th ed. 1984). [Id. at 637 (Miner, J., concurring).]
See Feldman v. Lederle Laboratories, 97 N.J. 429, 449, 479 A.2d 374 (1984), (Feldman I) (defect in product giving rise to strict liability may take the form of manufacturing flaw, design defect, or inadequate warning).
Although there are cases that arguably support the position of WesTech, each is distinguishable. In Kleemann v. McDonnell Douglas Corp. 890 F.2d 698 (4th Cir.1989), cert. denied, 495 U.S. 953, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990), for instance, plaintiffs sued a contractor, alleging failure to conform with reasonably precise Navy specifications with respect to the landing gear of a F/A-18 fighter jet. In affirming summary judgment for the contractor, the court said:
Plaintiffs' claim is precisely the sort for which the defense was intended. This is true both because of the nature of defendant's product and the characteristics of the process by which it was designed. At issue here is a discretionary decision involving military hardware in which the government was a substantial participant.
* * * * * * * *
It is hard to imagine a matter more uniquely in the province of the military  and one less appropriate to second-guessing by civilian courts  than the development of a high technology, multi-mission aircraft.

*535 Similarly, the design details of the F/A-18 illustrate the balancing of military and technological factors, including "the trade-off between greater safety and greater combat effectiveness." [citation omitted] For example, the main landing gear at issue here had to absorb extremely high amounts of energy generated upon landing on a carrier. On the other hand, stowage of the gears could not interfere with external weapon storage. These competing concerns required a unique "levered gear" design to provide adequate distance between the extended right and left main landing gears and thereby ensure stability of the aircraft upon landing. The design, developed by MDC and approved by the Navy, employed a planning link assembly to deplane the wheels during retraction and extension of the landing gear. [Id. at 700-701 (citations omitted).]
After exchanging views in the procurement process with defendant, balancing military and technological factors, and maintaining "an extensive staff of aircraft engineers" on site at defendant's facilities, the Navy had exercised discretion regarding the landing gear to be used. Id. at 701. Against this backdrop, the court reasoned:
It is this salient fact of governmental participation in the various stages of the aircraft's development that establishes the military contractor defense. Indeed, active governmental oversight is relevant to all three elements of defendant's burden. Where, as here, the Navy was intimately involved at various stages of the design and development process, the required governmental approval of the alleged design defect is more likely to be made out. [citations omitted] Similarly, the Navy's extensive participation, including reservation of the power to approve or disapprove design modifications, enhances the likelihood of final product conformity. Government involvement in the process also makes it more likely, though not certain, that a sharing of information will occur with respect to potential dangers in the use of equipment. [Ibid. (citations omitted).]
Here, unlike Kleemann, there are no specifications with respect to safety devices. There is nothing in the record to indicate that the government exercised any discretion in this regard, let alone balanced any technical or military considerations or shared information concerning potential dangers. Stated differently, plaintiff in Kleemann attacked as defective the very item upon which the Navy had exercised its discretion, i.e., the landing gear. This is far different than the situation here, where Anzalone attacks a defect that the government specifications had not addressed and left to WesTech's discretion. Had the Navy required certain safety mechanisms, but not particularized any type of design, WesTech would then be able to argue that it had *536 conformed with reasonably precise specifications even if it had not employed the safest device. That did not happen here, however.
Harduvel v. General Dynamics Corp., supra (878 F.2d 1311) is likewise distinguishable. In Harduvel, the widow of a fighter pilot who died in a training exercise brought suit against the manufacturer of the F-16 aircraft, asserting that "wire chaffing" or a massive electrical failure had caused the fatal crash. A jury found defendant liable and awarded plaintiff and the deceased's estate a total of $3.1 million in damages. The Eleventh Circuit reversed, because the government had exercised discretion over the electrical system.
Here, however, the record reasonably supports an inference that the government ignored any safety measures. Furthermore, the Kleemann and Harduvel courts refused to equate failure to perform, i.e., the landing gear in Kleemann and the electrical system in Harduvel, with an absence of conformity. There is an obvious absence of conformity with reasonably precise specifications here because no guidelines or specifications exist with respect to safety devices or measures.
More importantly, WesTech cannot be accorded immunity here based upon the government contractor defense because it could have fulfilled both its contractual obligation to the government and a state-prescribed duty of care,[4] as it is abundantly clear that no significant conflict exists between them. Although a conflict alone will not suffice to displace state law, the absence of one certainly precludes pre-emption by so-called federal common law, as stated by Justice Scalia, "[b]ut conflict there must be." Thus, the Navy did not make WesTech do anything  it chose not to provide any safety measures or warnings and, in the absence of such significant conflict, state tort law applies.
*537 Nor can WesTech claim that the Navy imposed a significant conflict by deciding not to adopt safety devices or guards because the government neither expressly prohibited nor required any type of safety mechanisms or warnings on the ram tensioner in question. Indeed, the very absence of any specific guidelines or criteria within the otherwise precise specifications evinces indifference on the part of the Navy regarding safety mechanisms.
Moreover, since the Navy did not exercise any discretion with respect to safety measures, it cannot be said now that it is being "second-guessed" or its governmental discretion is being infringed upon because it never considered the issue in the first place. Finally, WesTech cannot establish that in making its decisions concerning safety devices it had been acting in compliance with reasonably precise specifications because there were no such safety specifications set forth.
Anzalone's assertion that WesTech had either a contractual or common law duty to install the ram tensioner or inspect its positioning aboard ship is without merit. The naval specifications simply do not contain any provision that required WesTech to "install" the ram tensioners it sold to the Navy. Even if they did, the Navy had the authority to depart from such specifications. In any event, based on the record, WesTech was not involved with the installation of the particular ram tensioner.
Reversed and remanded for further proceedings consistent herewith.
NOTES
[1] Judge VILLANUEVA did not attend oral argument but has participated in this appeal by consent of the attorneys.
[2] Obviously jurisdiction in this state is grounded on the New Jersey residence of Anzalone. WesTech's attempt to remove the matter to the federal court was rejected.
[3] According to a certification of R.T. Hawley, then chief engineer for WesTech, the procurement request had modified and supplemented specification SHIPS-T-3945.
[4] We recognize the potential theoretical problem of different state law applications dependent upon the residence of an injured plaintiff where the injury occurs outside the jurisdiction. In the absence of a controlling authority, however, a state court can apply appropriate conflict of law criteria. Since the issue has not been raised or briefed, we merely note the problem.