661 A.2d 796

JOHN ANZALONE, PLAINTIFF–RESPONDENT, v. WESTECH GEAR CORPORATION (FORMERLY KNOWN AS OR AS SUCCESSOR TO WESTERN GEAR CORPORATION), DEFENDANT–APPELLANT, AND "JOHN DOE" GEAR CORPORATION (A FICTITIOUS NAME BEING ANY PRESENTLY UNKNOWN MANUFACTURER OR DISTRIBUTOR OF THE GEAR MECHANISM CAUSING INJURY TO THE PLAINTIFF; "JOHN SMITH" INSTALLATION CORPORATION (A FICTITIOUS NAME BEING ANY PRESENTLY UNKNOWN INSTALLER OF THE GEAR MECHANISM CAUSING INJURY TO THE PLAINTIFF), DEFENDANTS.

Argued November 29, 1994—Decided July 26, 1995.

*Thomas T. Chappell* argued the cause for appellant.

*Maurice H. Connelly* argued the cause for respondent.

PER CURIAM.

The members of the Court being equally divided, the judgment of the Appellate Division is affirmed.

HANDLER, J., concurring.

This is a products-liability case in which a civilian employee of the United States Navy was injured on shipboard by a device supplied to the Navy by a federal government contractor. The employee brought this action against the contractor, contending that the device, called a "ram tensioner," was defectively designed in that it did not have safety features that could have prevented such accidents and, therefore, the contractor is liable for that design defect under the state common-law duty to provide safe products. The contractor, invoking the government contractor defense, denies liability because the ram tensioner had been designed and manufactured without any safety features in strict conformance with specific and detailed government specifications, which preempt any contrary state-law duty.

The trial court, concluding that the government contractor defense was applicable, entered summary judgment in favor of the contractor. On appeal, the Appellate Division disagreed and reversed the lower court judgment. 271 *N.J.Super.* 522, 638 *A.*2d 1365 (1994). The contractor filed a petition for certification, which this Court granted. 137 *N.J.* 314, 645 *A.*2d 142 (1994). The sole issue for the Court's determination is the applicability of the government contractor defense.

## I

Plaintiff John Anzalone was a civilian employee of the United States Navy working as a steward aboard the USNS Waccamaw, a naval tanker used for transporting fuel and supplies to vessels at sea. On March 20, 1987, he was engaged in a fuel-replenishment operation in which the ram tensioner was used. The function of the ram tensioner was explained by the Appellate Division:

> During a typical replenishment operation, a wire rope known as a "spanwire" or "highline" extends from the delivering ship to the receiving ship to provide support for connecting fuel and supply lines. The spanwire is reeved through a ram tensioner, which contains a series of pulleys at both ends of a vertical column (collectively termed the upper and lower sheave block or assembly). It is operated by a hydraulic ram to maintain constant tension on the spanwire by either "paying out" or "taking in" the spanwire so as to prevent supply lines from falling into the water.

[271 *N.J.Super.* at 524–25, 638 *A.*2d 1365]

While walking near the open and unguarded lower sheave block of the ram tensioner, Anzalone tripped and, falling forward, reached out and grabbed with his left hand one of the spanwires that was being fed vertically downward from the upper sheave assembly. As the spanwire passed through the lower sheave block, Anzalone's left hand was partially amputated. *Id.* at 525, 638 *A.*2d 1365.

Anzalone filed a complaint against defendant WesTech Gear Corporation (WesTech) in the Superior Court of New Jersey, Hudson County Division, seeking damages for his injuries. The complaint alleged that the ram tensioner had been negligently and defectively designed and manufactured by defendant, then known as Western Gear Corporation, and, consequently, WesTech was liable because it had distributed and installed the ram tensioner. WesTech answered the complaint, asserting that the ram tensioner had been designed and furnished in accordance with government specifications, and, therefore, recovery was barred by the government contractor defense as enunciated by the United States Supreme Court in *Boyle v. United Technologies Corp.*, 487 *U.S.* 500, 108 *S.Ct.* 2510, 101 *L.Ed.*2d 442 (1988).

The trial court determined, on defendant's motion for summary judgment, that the government contractor defense was available to WesTech because the design of the ram tensioner, which did not provide for any safety features with respect to lower sheave assembly, conformed to detailed and specific specifications approved by the government. 271 *N.J.Super.* at 528, 638 *A.*2d 1365. The Appellate Division, however, reversed the judgment of the trial court, concluding that the government contractor defense was not applicable because WesTech was not prohibited by the terms of its contract specifications from including safety devices on the lower sheave assembly of the ram tensioner. *Id.* at 537, 638 *A.*2d 1365.

Substantially for the reasons set forth in the opinion of Judge Petrella, we affirm the judgment of the Appellate Division. We hold that the government specifications, according to which the ram tensioner was designed, manufactured and supplied, did not impose any requirements that would conflict with the duty of the contractor under state law to provide a product that incorporated a safety feature for the lower sheave assembly of the ram tensioner, and, hence, the government contractor defense is not applicable as a bar to defendant's liability.

## II

The government contractor defense was formulated by the United States Supreme Court in the *Boyle* case. There, a U.S. Marine helicopter copilot was killed when his helicopter crashed off the Virginia coast during a training mission. He drowned because he was unable to escape from the helicopter when water pressure sealed the craft's outward-opening emergency escape hatch. *Id.* at 502, 108 *S.Ct.* at 2513, 101 *L.Ed.*2d at 451.

The victim's father sued the manufacturer of the helicopter, under Virginia tort law, alleging that the manufacturer was liable for his son's death in failing to build an inward-opening escape hatch. *Id.* at 502–03, 108 *S.Ct.* at 2513–14, 101 *L.Ed.*2d at 451–52. The government's specifications for the helicopter provided for an

outward-opening escape hatch. *Id.* at 509, 108 *S.Ct.* at 2516–17, 101 *L.Ed.*2d at 456. A jury found for the plaintiff. *Id.* at 503, 108 *S.Ct.* at 2513–14, 101 *L.Ed.*2d at 452. On appeal, the Court of Appeals for the Fourth Circuit reversed and remanded, holding that, as a matter of federal common law, the manufacturer could not be held liable for the alleged design defect in the escape hatch because it had met the requirements of the military contractor defense. *Ibid.* The United States Supreme Court vacated and remanded. *Id.* at 514, 108 *S.Ct.* at 2519–20, 101 *L.Ed.*2d at 459.

The Supreme Court recognized that although the government contractor defense serves to preempt state tort law, the defense need not be based on legislation immunizing government contractors from liability for defective products under state law. Acknowledging that federal preemption of state law in most situations requires a clear statutory prescription or a direct conflict between federal and state law, the Court observed that preemption can also arise when an area is expressly committed to federal control. When an area is "so committed by the Constitution and laws of the United States to federal control," federal courts may replace state law with "federal law of a content prescribed (absent explicit statutory directive) by the courts—so-called 'federal common law.'" *Id.* at 504, 108 *S.Ct.* at 2514, 101 *L.Ed.*2d at 452–53 (citation omitted).

Federal government contracting is an area that is clearly committed to federal control and raises special federal concerns. *Id.* at 504, 108 *S.Ct.* at 2514, 101 *L.Ed.*2d at 453 (citation omitted). A military contractor fulfilling a procurement contract is similar to a federal official performing governmental duties because both "obviously implicate[ ] the same interest in getting the Government's work done." *Id.* at 505, 108 *S.Ct.* at 2515, 101 *L.Ed.*2d at 453. Hence, a suit against a private party involving a military contract raises two "uniquely federal interests": the civil liability of federal officials for actions taken in the course of their duties and the government's rights and obligations under its contracts. *Id.* at 504–05, 108 *S.Ct.* at 2514–15, 101 *L.Ed.*2d at 452–53.

The Supreme Court stressed, however, that the presence of a federal interest alone was not reason enough "for the displacement of state law." Rather,

[d]isplacement will occur only where ... a "significant conflict" exists between an identifiable "federal policy or interest and the [operation] of state law," or the application of state law would "frustrate specific objectives" of federal legislation. [*Id.* at 507, 108 *S.Ct.* at 2516, 101 *L.Ed.*2d at 454–55 (citations omitted).]

The Supreme Court further recognized, in the context of military procurement, the need for a "limiting principle" in determining the existence of a "significant conflict" between federal and state interests. *Id.* at 509, 108 *S.Ct.* at 2517, 101 *L.Ed.*2d at 456. It found that "limiting principle" in the discretion that inheres in federal government procurement.[1] 487 *U.S.* at 511, 108 *S.Ct.* at 2518, 101 *L.Ed.*2d at 457. The design of equipment, the Court pointed out, "often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." *Id.* at 511, 108 *S.Ct.* at 2518, 101 *L.Ed.*2d at 457. "It makes little sense," the Court added, "to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production." *Id.* at 512, 108 *S.Ct.* at 2518, 101 *L.Ed.*2d at 457–58.

The Supreme Court thus concluded that "state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict'

---

[1] That discretion was analogized to the "discretionary function exception" to the Federal Tort Claims Act (FTCA), which, the Supreme Court felt, adequately set the parameters of a "significant conflict" between federal and state law in the context of federal government procurement. *Id.* at 511, 108 *S.Ct.* at 2518, 101 *L.Ed.*2d at 457. That exception to the FTCA, 28 U.S.C. § 2680(a), applies to

[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

[28 U.S.C. § 2680(a).]

with federal policy and must be displaced." *Id.* at 512, 108 *S.Ct.* at 2518, 101 *L.Ed.*2d at 458. To identify those circumstances in design-defect cases, the Court formulated a three-part test:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.
>
> [*Id.* at 512, 108 *S.Ct.* at 2518, 101 *L.Ed.*2d at 458.]

The Court further amplified the reasons for this test:

> The first two of these conditions assure that the suit is within the area where the policy of the "discretionary function" would be frustrated—i.e., they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability. We adopt this provision lest our effort to protect discretionary functions perversely impede them by cutting off information highly relevant to the discretionary decision.
>
> [*Id.* at 512–13, 108 *S.Ct.* at 2518–19, 101 *L.Ed.*2d at 458.]

Many, if not most, design-defect cases, in which the government contractor defense is raised, determine the existence of a "significant conflict" by resort to the three-part test of *Boyle*. *E.g.*, *Harduvel v. Gen. Dynamics Corp.*, 878 *F.*2d 1311 (11th Cir.1989), *cert. denied*, 494 *U.S.* 1030, 110 *S.Ct.* 1479, 108 *L.Ed.*2d 615, *reh'g denied*, 495 *U.S.* 942, 110 *S.Ct.* 2199, 109 *L.Ed.*2d 525 (1990); *Smith v. Xerox Corp.*, 866 *F.*2d 135 (5th Cir.1989). As stated in *In re Aircraft Crash Litigation Frederick, Md.*, 752 *F.Supp.* 1326 (S.D.Ohio 1990), *aff'd sub nom. Darling v. Boeing Co.*, 935 *F.*2d 269 (6th Cir.1991):

> [W]here the three *Boyle* elements are satisfied, a military contractor is entitled to immunity from suit under state tort law. If state law would impose liability where the three *Boyle* elements are met, the requisite "significant conflict" is present, and state law is preempted.
>
> [*Id.* at 1336.]

One design-defect case, *Lewis v. Babcock Industries, Inc.*, 985 *F.*2d 83 (2d Cir.), *cert. denied*, —— *U.S.* ——, 113 *S.Ct.* 3041, 125 *L.Ed.*2d 727 (1993), considered whether a "significant conflict" requires an antecedent showing of a significant conflict before

application of the three-part *Boyle* test. In that case, Lewis was seriously injured in a jet fighter accident during training. He sued the manufacturer of one of the plane's components, the malfunction of which allegedly caused the accident. Lewis argued that the *Boyle* three-part test did not come into play until the defendant first shows a significant conflict between the requirements under the federal contract and state tort law. The court rejected that analysis and concluded that the determination of a "significant conflict" is part of the *Boyle* test and not a prerequisite to it. *Id.* at 86. It stated that "[t]he purpose of the first part of the test, approval of reasonably precise specifications, is to determine whether a conflict with state law exists at all." *Ibid.* Drawing from *In re Joint Eastern and Southern District New York Asbestos Litigation*, 897 *F.*2d 626 (2d Cir.1990) ("*Grispo*"), the court further noted,

[A] federally imposed contract requirement displaces only a parallel state law requirement. If the Government did not approve reasonably precise specifications for the design feature in question, there is no conflict with state law. On the other hand, if the Government did approve such specifications, conflicting state tort law is preempted. Thus, answering the question whether the Government approved reasonably precise specifications for the design feature in question necessarily answers the question whether the federal contract conflicts with state law.

[985 *F.*2d at 86–87 (footnote and citation omitted).]

We concur in the reasoning of those courts that find the operative standard for determining whether a significant conflict exists to justify the preemption of state liability law is that expressed by the three elements of the *Boyle* test. The question, then, that must be answered in this case is whether there is a "significant conflict" between our State's products-liability law applicable to design defects and the federal government's procurement policy as reflected in the government's contract specifications, according to which the ram tensioner was designed and supplied. The answer to that question must ultimately focus on whether such a conflict, if any, relates to the presence or absence of safety features as an important characteristic in the government-approved design of the ram tensioner.

## III

In applying the *Boyle* test for preemption, we must determine basically whether the ram tensioner was designed in conformity with "reasonably precise specifications" that were "approved" by the federal government. The Appellate Division fully recapitulated the content of those specifications and the circumstances surrounding their formulation and application. 271 *N.J.Super.* at 525–28, 638 *A.*2d 1365.

A. Martin Hanke, a Navy engineer from 1941 to 1973, originated the concept of the ram tensioner. 271 *N.J.Super.* at 525, 638 *A.*2d 1365. According to his certification, the Navy awarded the first contract for design and development to Sancor Corporation in 1958. *Ibid.* On August 7, 1961, after testing and evaluating the Sancor ram tensioner at sea, the Navy drafted specification SHIPS–T–3945. *Ibid.*[2] Based on that specification and the final Sancor drawings, the Navy issued a procurement request that sought proposals for the development, manufacture, and testing of seventy-eight hydraulic ram tensioners. *Id.* at 526, 638 *A.*2d 1365. The Navy subsequently awarded defendant the contract to manufacture the ram tensioners. *Ibid.*

Charles S. Forve was the defendant's manager of contracts and special products, and had been employed by defendant since 1968. *Ibid.* Forve certified that a subcontractor for WesTech provided the Navy with the ram tensioner in either late 1963 or early 1964. *Ibid.* He stated that "[a]ll of the ram tensioners provided to the Navy or Naval suppliers by Western Gear/WesTech were manufactured in accordance with strict written military specifications." *Ibid.* Furthermore, according to Hanke, the "ram tensioner was a piece of U.S. Navy deck machinery, conceived and developed by the Navy at Navy expense, and its design and application on U.S.

---

[2] The specifications were set forth in Bureau of Ships Contract Specification, Tensioner, Hydraulic Ram (SHIP–T–3934), published August 7, 1961. The specification also appear at MIL–T–2333a(SHIPS), June 27, 1962. The two versions are substantially the same.

Navy ships was completely controlled by the U.S. Navy." *Id.* at 527, 638 *A.*2d 1365.

R.T. Hawley worked at WesTech from 1939 to 1979 and was chief engineer primarily responsible for the development and manufacture of ram tensioners for installation on naval ships. *Ibid.* He certified that "[t]he installation of ram tensioners and the positioning of ram tensioners within the fuel replenishment system was done by the Navy with absolutely no involvement on the part of Western Gear." *Id.* at 528, 638 *A.*2d 1365. Hanke similarly indicated that the contractor "had no authority to install the ram tensioners it provided and had absolutely no input as to the placement of a ram tensioner within [a replenishment] configuration;" rather, the "[i]nstallation and arrangement of the ram tensioner was the sole responsibility of the Navy and the ship builder." *Id.* at 527, 638 *A.*2d 1365.

The specifications thus were formulated and approved by the federal government. Further, the ram tensioner was manufactured and supplied in conformity with those specifications, and it was installed under the control and direction of the federal government. Most importantly, the specifications included requirements for all materials; the type of sheaves to be used; the bearings for the sheaves; stress calculations; requirements for size and weight; standards for the bedplate base assembly; provisions for the type of mesh screen in a handpump; the design, including material to be used, for the air-fluid accumulator, the ram cylinder assembly, and the control block assembly; measurements and material for the storage tank; and the finish to be used on all parts. In sum, the specifications for the ram tensioner were very detailed and specific.

The Supreme Court's decision in *Boyle* indicates that "reasonably precise specifications" alone do not establish a "significant conflict" between the federal government's contractual interests and the state's interests under its tort laws. Notwithstanding reasonably detailed specifications, a "significant conflict" would not arise if, as stated in *Boyle,* "the duty sought to be imposed on the

contractor is not identical to one assumed under the contract, but is also not contrary to any assumed." *Id.* 487 *U.S.* at 509, 108 *S.Ct.* at 2516–17, 101 *L.Ed.*2d at 455–56. If it is possible for the contractor to "comply with both its contractual obligations and the state-prescribed duty of care[, n]o one suggests that state law would generally be pre-empted in this context." *Ibid.* "Stripped to its essentials, the military contractor's defense under *Boyle* is to claim: 'The Government made me do it.'" *Grispo, supra,* 897 *F.*2d at 632.

Conversely, as expressed in *Lewis, supra,* "If the Government did not approve reasonably precise specifications for the design feature in question, there is no conflict with state law." 985 *F.*2d at 86. *Boyle* itself pointed out that no "significant conflict" would exist if under state law, "a duty of care to include a certain safety feature" was neither "contrary" nor "identical to anything promised the Government," so that "the contractor could comply with both its contractual obligations and the state-prescribed duty of care." 487 *U.S.* at 508–09, 108 *S.Ct.* at 2516–17, 101 *L.Ed.*2d at 456–57.

The helicopter specifications considered in the *Boyle* case presented a prototypical situation in which compliance with both duties was impossible, and thus presented a significant and irreconcilable conflict between federal and state interests. The Court observed:

> Here the state-imposed duty of care that is the asserted basis of the contractor's liability (specifically, the duty to equip helicopters with the sort of escape-hatch mechanism petitioner [Boyle] claims was necessary) is precisely contrary to the duty imposed by the Government contract (the duty to manufacture and deliver helicopters with the sort of escape-hatch mechanism shown by the specifications).
>
> [*Id.* at 509, 108 *S.Ct.* at 2517, 101 *L.Ed.*2d at 456].

In this case, however, we are not confronted with "precisely contrary" duties with respect to a specific characteristic or safety feature of the product. Significantly, the specifications for the ram tensioner omitted any safety features relating to the sheave block and the spanwire that could have prevented the accident. Literally, the specifications neither required nor prohibited the

inclusion of such a safety feature. Thus, in this case, it does appear, in the language of *Boyle*, that "the duty sought to be imposed on the contractor"—the inclusion of a safety feature on the ram tensioner—"is not identical to one assumed under the contract" or "promised the Government," nor is it "contrary to any [duty] assumed."

Nevertheless, the literal application of specifications is not the key to whether there is a "significant conflict." The omission of a specification does not automatically negate the existence of a significant conflict between design-defect liability under state tort law and the federal government's procurement policies. Such a conflict would arise if it could be shown that the "design feature in question"—here, the omission or the absence of a safety feature— was itself "considered by a Government officer," and thus falls "within the area where the policy of the 'discretionary function' would be frustrated." *Boyle, supra,* 487 *U.S.* at 512, 108 *S.Ct.* at 2518–19, 101 *L.Ed.*2d at 458. *See Harduvel, supra,* 878 *F.*2d 1311 (reversing jury verdict in favor of widow of fighter pilot who died in training exercise, in which plaintiff asserted that "wire chaffing" or a massive electrical failure had caused the fatal crash of F–16 aircraft; ruling that government contractor defense applied because the government had focused meticulous consideration and exercised discretion over the entire electrical system); *see also Kleemann v. McDonnell Douglas Corp.* 890 *F.*2d 698, 700–01 (4th Cir.1989), *cert. denied,* 495 *U.S.* 953, 110 *S.Ct.* 2219, 109 *L.Ed.*2d 545 (1990) (affirming summary judgment for contractor sued by plaintiffs for defective landing gear of a F/A–18 fighter jet; noting, further, extensive government participation and intimate involvement in the planning, development and approval of the feature involved in alleged design defect).

The omission of any specification covering a particular feature of a product alters the inquiry into whether the imposition under state law of a specific requirement with respect to that feature will create a significant conflict with government-procurement policies. That is exemplified in products-liability cases based on a failure to

warn. In *Dorse v. Armstrong World Industries, Inc.*, 716 *F.Supp.* 589 (S.D.Fla.1989), *aff'd o.b.*, 898 *F.*2d 1487 (11th Cir.1990), the court determined that the government contractor defense did not apply because there was no conflict between a state-law duty to warn and compliance with the government specifications. The Eleventh Circuit reasoned that, in contrast to the situation facing the Supreme Court in *Boyle*, in its case

> specifically, the state-imposed duty of care that is the asserted basis of the contractor's liability (warning of the danger) is not "precisely contrary" to the duty imposed by the government contract (the duty [to] manufacture and deliver cement containing asbestos). In fact, the evidence suggests that *no* conflict exists between the state tort duty and the federal contractual duty. The defendant's exhibit of Navy Department specifications does not contain any prohibition against health warnings on the product. \* \* \* "The contractor could comply with both its contractual obligations and the state-prescribed duty of care." *Boyle*, [487 *U.S.* at 509] 108 S.Ct. at 2517. State law cannot be displaced in this context.
>
> [898 *F.*2d at 1489–90.]

See *Garner v. Santoro*, 865 *F.*2d 629 (5th Cir.1989) (remarking on "the difficulty that a defendant will have under *Boyle* in establishing an identifiable federal interest or policy in the existence or methods of warning and a significant conflict between federal interest or policy and the operation of state law."); *In re Hawaii Fed. Asbestos Cases*, 960 *F.*2d 806 (9th Cir.1992) (holding there was "no conflict between [defendants'] state law duty to provide adequate warnings to the users of their insulation and the conditions imposed on them pursuant to the agreements they had entered into with the Government"); *Glassco v. Miller Equip. Co., Inc.*, 966 *F.*2d 641, 643–44 (11th Cir.1992) (finding government contractor defense inapplicable to manufacturer who failed to warn government and end users that a leather belt would have a limited useful life because there was no significant conflict between the government specifications and the state-imposed duty to warn); *In re New York City Asbestos Litig.*, 144 *Misc.*2d 42, 542 *N.Y.S.*2d 118, 121 (N.Y.Sup.Ct.1989) (holding that because military specifications for asbestos products said practically nothing about health warnings, manufacturer could have complied with both

specifications and duty to provide adequate warnings on the packages without frustrating any identifiable federal interest).

Some courts have concluded that the government contractor defense, though originating with *Boyle*, a design-defect case, is applicable in failure-to-warn cases. *E.g., Lewis v. Babcock, supra* (determining that *Boyle* applied not only to design defect suits, but also to failure-to-warn claims); *Garner v. Santoro, supra*, 865 *F.*2d at 642 (holding, after analyzing *Boyle*, that the contractor defense can be applied in a failure-to-warn case); *Dorse v. Armstrong World Indus., Inc., supra*, 716 *F.Supp.* 589 (determining that although the contractor defense expressed by *Boyle's* three-part test itself is limited to design-defect cases, the reasoning underpinning *Boyle* applies in the failure-to-warn context); *cf. Harduvel, supra*, 878 *F.*2d at 1317 (*Boyle*, by its terms, applies only to defects in design); *Nicholson v. United Technologies Corp.*, 697 *F.Supp.* 598, 604 (D.Conn.1988); *Niemann v. McDonnell Douglas Corp.*, 721 *F.Supp.* 1019, 1024–25 (S.D.Ill.1989). We have recognized the parallel between the duty to provide a safe product with adequate warnings and the duty to provide a product that is safely designed. *Feldman v. Lederle Lab.*, 97 *N.J.* 429, 449, 479 *A.*2d 374 (1984) (noting that defect in product giving rise to strict liability may take the form of manufacturing flaw, design defect, or inadequate warning). *See Grispo, supra*, 897 *F.*2d 626, 637 ("Defects in product manufacturing and design and failure to warn of product hazards are all of a piece under the general rubric of strict products liability") (citation omitted) (Miner, J., concurring).

■ The failure-to-warn cases are instructive because they often involve the omission of any specification pertaining to the feature in question, namely, a warning. In that context, the duty to warn imposed under state tort law will not pose a duty that is "precisely contrary" to the requirements of the government specifications. Consequently, the analysis necessary to determine the existence of a significant conflict shifts to whether that omission itself was the result of a conscious and purposeful decision and,

therefore, reflects the exercise of discretion by the government. Thus, in *Grispo*, the Navy had issued instructions pertaining to the packaging, packing, and labeling of the asbestos-based cement product that had been supplied by a contractor. The court ruled:

> The contractor must show that whatever warnings accompanied a product resulted from a determination of a government official, *see Boyle* [487 *U.S.* at 512], 108 *S.Ct.* at 2518 ("feature in question [must be] considered by a Government officer, and not merely by the contractor itself"), and thus that the Government itself "dictated" the content of the warnings meant to accompany the product. *See Nicholson,* 697 *F.Supp.* at 604. Put differently, under *Boyle,* for the military contractor defense to apply, government officials ultimately must remain the agents of the decision.
>
> [*Id.* at 630.]

  *  *  *  *  *  *  *  *

> *Boyle* displaces state law only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion.
>
> [*Id.* at 632.]

*See also Jackson v. Deft, Inc.,* 223 *Cal.App.*3d 1305, 273 *Cal.Rptr.* 214, 221 (1990) (stressing in failure-to-warn case that although "certain warnings were required by the military specifications, * * * the specifications [did not] place any limitation on additional information from the manufacturers to users of their products").

We must thus consider in assessing the contractual significance of the failure to include any safety features in the specifications for the ram tensioner, whether the government made an affirmative and definite decision to exclude safety features from the lower sheave assembly of the ram tensioner and whether, therefore, the omission of any such specifications was an exercise of government discretion.

The record yields significant clues as to what the federal government considered important in the design of the ram tensioner and the lack of importance it ascribed to safety features. Forve stated explicitly that "[t]he military specifications for ram tensioners have never required guards for the lower sheave block

of the ram tensioner." 271 *N.J.Super.* at 526, 638 *A.*2d 1365. Although noting that the specifications "establish[ed] a pattern of detail and precision," Hanke stated that "[d]uring my tenure with the Navy, guards for the lower sheave blocks of ram tensioners were never required by the specifications or the accompanying drawings in a procurement of ram tensioners." 271 *N.J.Super.* at 526–27, 638 *A.*2d 1365.

As stated by the Appellate Division, "the record reasonably supports an inference that the government ignored any safety measures," and that "the very absence of any specific guidelines or criteria within the otherwise precise specifications evinces indifference on the part of the Navy regarding safety mechanisms." 271 *N.J.Super.* at 536, 638 *A.*2d 1365. Thus, the absence of either an express prohibition or requirement for "any type of safety mechanisms or warnings on the ram tensioner" did not evidence a decision by the Navy "not to adopt safety devices or guards." *Id.* at 537, 638 *A.*2d 1365. Hence, the omission from the specifications of any safety feature does not imply a definite or conscious decision to deal with the safety aspects of the device or reflect the exercise of discretion with respect to any of its safety features.

Moreover, the omission of any safety features relating to the lower sheave assembly of the ram tensioner does not appear to be a choice exercised by the government between or among possible safety features. In contrast, in *Nicholson v. United Technologies Corp., supra,* 697 *F.Supp.* 598, in which a civilian employee sued the manufacturer of the landing gear of a military helicopter, which exploded while he was repairing it, the trial court granted the defendant's motion for summary judgment. The court emphasized that plaintiff had asserted a failure to provide adequate warnings on repair and disassembly of the gear in the maintenance manual, rather than any separate or "independent duty to warn." The court reasoned:

When the government provides or approves specifications of a product which calls for some safeguards but not others, the government contractor is not under a duty to provide every known safety device where it is not called for by the government contract ... The choice is that of the government. The contractor is obliged to

the government's decision. The same is undoubtably true if the government provides "reasonably precise" specifications for the contents of a maintenance manual. A contractor should not be held liable for deficiencies in the contents of a maintenance manual if the contents are dictated by the government.

[*Id.* at 603–04.]

In addition, a significant conflict can arise from specifications that reflect a comprehensive control consciously exercised by the government over the design of the product that includes express consideration of a specific feature, even though the specifications do not make any provision for that feature. *E.g., Harduvel, supra,* 878 *F.*2d 1311. The design of the ram tensioner, however, indicates that government discretion was exercised over characteristics of the device other than safety. The specifications provide:

The basic design objectives are that the equipment will meet the needs of the naval service and that the final product shall reflect the utmost in simplicity, have maximum reliability consistent with the state of the art, and be easy to install and maintain. The equipment shall be designed to withstand intermittent use over long periods of time under naval service conditions, without benefit of overhaul. The design shall include all possible features which will result in reliable and stable operation with reduced requirements for adjustment and alignment, reduced requirements for maintenance, and simplified maintenance, thus, reducing requirements for skilled personnel.

The record in this case discloses that the federal government was not concerned with the safety aspects of the ram tensioner or the need for provisions for safety features in the specifications. We thus fully agree with the Appellate Division, which found that "there is nothing in the record to indicate that the government exercised any discretion" with respect to safety devices, 271 *N.J.Super.* at 535, 638 *A.*2d 1365.

IV

We determine from the record that a safety feature for the lower sheave assembly of the ram tensioner may be required as a matter of state law without posing a significant conflict with identifiable government interests. Several considerations support that determination: (1) such a safety feature is omitted from the specifications in that it is neither expressly required nor expressly prohibited; further, there are no specifications relating to the

safety aspects of the lower sheave assembly; (2) the omission of such safety specifications is in the context of detailed and precise specifications, covering all of the important features of the product; the specifications were formulated, reviewed, considered and approved by the government; and (3) the objectives of the design of the product, reflected in the specifications, were functional efficiency, simplicity in operation and ease in installment and placement; safety in the operation of the lower sheave assembly was neither a paramount nor an incidental concern in the design of the product. It is thus inferable that a safety feature that would overcome the risk of injury from the operation of the lower sheave assembly could be incorporated into the product without substantially affecting or modifying any of the features required by the express specifications and without impairing the basic objectives of the design of the ram tensioner. In other words, it appears that the contractor could have fulfilled its duty to the government and simultaneously complied with a state-law duty to render the product safe without infringing on the discretion exercised by the government.

Accordingly, we conclude that there is no significant conflict between federal interests reflected in the government contract specifications and state policies under its products-liability law. Consequently, the government contractor defense is inapplicable, and it may not be interposed to preempt or displace state law.

Chief Justice WILENTZ and Justice STEIN, join in this opinion.

POLLOCK, J., dissenting.

I agree with the concurrence that "the operative standard for determining whether a significant conflict exists to justify the preemption of state liability law is that expressed by the three elements of the *Boyle* test." *Ante* at 264, 661 *A.*2d at 800. The *Boyle* test provides immunity to military contractors in respect of

design defects when (1) the federal government approved reasonably precise specifications, (2) the equipment conformed to those specifications, and (3) the contractor warned the government about known risks. *Boyle v. United Technologies Corp.*, 487 *U.S.* 500, 512, 108 *S.Ct.* 2510, 2518, 101 *L.Ed.*2d 442 (1988).

I disagree, however, with the concurrence's application of *Boyle* to this case. Unlike the concurrence, I believe that *Boyle* provides defendant WesTech Gear Corporation (WesTech) with the government contractor defense to the claim of plaintiff, John Anzalone. In my opinion, the concurrence has misinterpreted *Boyle.* Consequently, I dissent.

The concurrence has summarized the relevant facts pertaining to the design and manufacture of the ram tensioner that caused plaintiff's injuries: Mr. Hanke, a Navy engineer, originated the concept of the ram tensioner; Sancor Corporation, a Navy contractor, designed and developed the ram tensioner; WesTech contracted to manufacture ram tensioners based on the Navy's detailed specifications that included Sancor's final drawings; the ram tensioner provided by WesTech conformed to the Navy's specifications; and the Navy assumed complete control over the placement and installation of the ram tensioners. *Ante* at 265–267, 661 *A.*2d at 800–01.

Those facts satisfy the first two prongs of the *Boyle* test. The concurrence candidly acknowledges that WesTech fabricated the ram tensioners based on "very detailed and specific" drawings. *Ante* at 266, 661 *A.*2d at 801. In addition, it admits that "the ram tensioner was manufactured and supplied in conformity with those specifications." *Ante* at 266, 661 *A.*2d at 801. Plaintiff, moreover, does not claim that WesTech failed to warn the Navy of known risks. Yet, the concurrence infers that because the Navy did not explicitly forbid WesTech from installing a guard on the ram tensioner, WesTech had a duty to design and provide such a device. That inference stands *Boyle* on its head.

The Navy participated in the development of the ram tensioner and incorporated the detailed Sancor drawings into the Navy's specifications. Under *Boyle*, those facts reflect the Navy's determination of the appropriate balance "between greater safety and greater combat effectiveness." *See Boyle*, 487 *U.S.* at 511, 108 *S.Ct.* at 2518, 101 *L.Ed.*2d at 457. Yet, the concurrence holds that a government contractor who relies on that determination may be liable for resulting injuries. In *Boyle*, Justice Scalia perceived the problem with that approach. He warned:

> The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs. To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production.

> [487 *U.S.* at 511–12, 108 *S.Ct.* at 2518, 101 *L.Ed.*2d at 457–58.]

Justice Scalia then announced the three-part test for identifying those instances when a military contractor is entitled to immunity.

The flaw in the concurrence's analysis is that instead of applying the three-part *Boyle* test, it posits its own formula to determine whether the imposition of a duty on WesTech would create a "significant" conflict with the government's interests—precisely the question that *Boyle* answered. In effect, the concurrence would overrule the United States Supreme Court on an issue concerning the liability of contractors with the federal government.

To achieve that untoward result, the concurrence misconstrues *Boyle*. In that case, the Court stated in *dicta* that it could conceive of a case different from *Boyle*, "in which the duty sought to be imposed on the contractor is not identical to one assumed under the contract, but is also not contrary to any assumed." 487 *U.S.* at 509, 108 *S.Ct.* at 2517, 101 *L.Ed.*2d at 455–56. The Court then provided two examples in which, unlike in the present case,

the government had not participated in the design process. In the first hypothetical situation, the Court stated that:

> If, for example, the United States contracts for the purchase and installation of an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary.
>
> [487 *U.S.* at 509, 108 *S.Ct.* at 2517, 101 *L.Ed.*2d at 456.]

In the second hypothetical, which was similar to the facts of the *Boyle* case, the Court noted: "If, for example, a federal procurement officer orders, by model number, a quantity of stock helicopters that happen to be equipped with escape hatches opening outward, it is impossible to say that the Government has a significant interest in that particular feature." *Ibid.*

In both hypothetical cases, the manufacturer, not the federal government or another contractor hired by the government for that purpose, designed the potentially defective product. Here, in contrast, WesTech agreed to build the ram tensioner in accordance with precise specifications provided by the government.

The *Boyle* test expressly recognizes the inherent difference between a case in which a contractor designs and manufactures military equipment for the federal government and a case, such as the present one, involving the government's procurement of military equipment designed by, or in conjunction with, military engineers. The Court stated:

> [T]he selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function.... It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting "second-guessing" of these judgments through state tort suits against contractors would produce the same effect sought to be avoided.... In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a "significant conflict" with federal policy and must be displaced.
>
> [487 *U.S.* at 511–12, 108 *S.Ct.* at 2518, 101 *L.Ed.*2d at 457–58 (citation and footnote omitted).]

The very purpose of the *Boyle* test was to define those "circumstances [involving military design and procurement that] present a 'significant conflict' with federal policy...." 487 *U.S.* at 512, 108 *S.Ct.* at 2518, 101 *L.Ed.*2d at 458.

If the United States Navy had manufactured the ram tensioner, it would be immune under the Federal Torts Claims Act, 28 *U.S.C.A.* 2680(a). To impose liability on WesTech for making a product for which the Navy would not be liable if it had made the product itself contravenes that legislative immunity. As the United States Supreme Court stated in *Boyle*, "[i]t makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production." 487 *U.S.* at 512, 108 *S.Ct.* at 2518, 101 *L.Ed.*2d at 457–58.

I would reverse the judgment of the Appellate Division and reinstate the summary judgment granted by the Law Division.

Justices O'HERN and GARIBALDI join in this opinion.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER and STEIN–3.

*For reversal*—Justices POLLOCK, O'HERN and GARIBALDI–3.