**Philip J. RUSSEK and Deborah Russek, h/w, et al., Plaintiffs,**

v.

**UNISYS CORPORATION et al., Defendants.**

**Civ. A. No. 93–5738 (JEI).**

United States District Court, D. New Jersey.

April 10, 1996.

Greitzer and Locks by James J. Pettit, Cherry Hill, NJ, for Plaintiffs.

McKenna & Cuneo by Raymond Biagini (Argued), Mark Rowland, Washington, DC, and Porzio, Bromberg & Newman, P.C. by Steven P. Benenson, Morristown, NJ, for Defendant Unisys Corporation.

## OPINION

IRENAS, District Judge:

Plaintiffs in these consolidated actions [1] are all past or present employees of the United States Postal Service ("the Postal Service").[2] They bring state law design defect and failure to warn claims alleging that Multiple Position Letter Sorting Machines ("MPLSM") used by the Postal Service and manufactured by Burroughs Corporation ("Burroughs"), to which defendant Unisys Corporation ("Unisys") is successor-in-interest, caused them repetitive stress injuries ("RSIs"). Defendant Unisys has now moved for summary judgment solely on the grounds that the government contractor defense enunciated by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), and extended to nonmilitary government contractors by the Third Circuit in *Carley v. Wheeled Coach*, 991 F.2d 1117 (3d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 191, 126 L.Ed.2d 150 (1993), preempts plaintiffs' state law claims.

██ Under *Boyle* and *Carley*, state law causes of action against government contractors are preempted where (1) the government approves reasonably precise specifications, (2) the equipment conformed to those

1. In addition to the lead case, Civil Action Number 93–5738, our records reflect as consolidated cases Civil Action Numbers 93–5739, 93–5740, 94–2054, and 94–5055.

2. Pursuant to the Postal Reorganization Act of 1970, 39 U.S.C. §§ 201–08, the Post Office Department was renamed the United States Postal Service. This opinion shall refer to the entity as the "Postal Service" throughout.

specifications, and (3) the contractor warned the government about all dangers in the use of the equipment that were known to the contractor but not to the government. *Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518–19; *Carley*, 991 F.2d at 1119. Plaintiffs contend that defendant has not met the first and third elements of *Boyle* and *Carley* on the design defect claim, and that the government contractor defense does not apply to the failure to warn claim.

Plaintiffs have also moved, pursuant to Fed.R.Civ.P. 56(f), for further discovery before the Court decides the summary judgment motion. The Court granted this motion following oral argument. In spite of the additional discovery granted plaintiff, the Court finds that defendant has met its burden of proof of establishing the government contractor defense on the design defect claim, and the motion for summary judgment on that claim will therefore be granted. The Court also holds that *Boyle* applies to the failure to warn claim and that defendant has established all three elements of the defense on that claim.

## I. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Normally, the burden is on the *nonmoving* party to establish a genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). However, defendant carries the burden of proving each element of the government contractor defense. *Carley*, 991 F.2d at 1125. Therefore defendant, the moving party, must establish that there is no genuine issue of material fact as to each element of the defense. *Id.* In other words, defendant "must come forward with evidence on summary judgment which would entitle it to a directed verdict if the evidence went uncon-

troverted at trial." *Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 802 (5th Cir. 1993) (internal quotations and alterations omitted). Only after defendant meets this burden are plaintiffs required to come forward with "significant, probative evidence." *Id.*

## II. BACKGROUND

Plaintiffs were all Postal Service employees at some time between 1976 and the present, and all worked at a mail sorting facility in Bellmawr, New Jersey. Plaintiffs now allege that they suffered RSIs due to their operation of the keyboard on defendant's MPLSMs. Each plaintiff's spouse has also brought a pendent state law claim for loss of consortium.

RSIs are a variety of repetitive stress-related injuries to the hand, wrist, and arm. Among the most common RSIs are tendonitis, tenosynovitis, carpal tunnel syndrome, and ganglion cysts. (Defendant's Ex. 47 at 1.) The study of how RSIs are caused and how to avoid them is included within the field of "ergonomics," which involves the study of the relationship between people and things.

The Postal Service uses the MPLSM to sort mail. One MPLSM is approximately seventy-seven feet long and twelve feet high, with twelve operator stations. Mail proceeds along a track in the MPLSM and comes to a brief stop before an operator station, where a Postal Service employee quickly reads the address and types in a code that directs the mail to a sorting bin on the other side of the machine according to its ultimate destination.

At issue in this case is the operating stations, and specifically the keyboards, utilized on the MPLSMs. The original keyboard on the MPLSMs consisted of two ten-key, piano-style keyboards arranged in two tiers that were used to input street addresses for incoming mail and city and state destinations for outgoing mail. In the 1970's, the MPLSM design was modified by the Zip Mail Translator ("ZMT") system, which accommodated the Postal Service's switch to the use of zip codes for guiding mail. The ZMT consisted of a ten-key piano-style keyboard that allowed operators to sort mail according to zip code.

For the purposes of this motion, Unisys admits its potential liability as the successor of Burroughs. In 1956, a model MPLSM was developed by Rabinow Engineering Corporation ("Rabinow"). (Defendant's Ex. 2.) In 1958, Burroughs was awarded a contract to construct ten prototype Model 120/121 MPLSMs. (Defendant's Ex. 5.) Apparently, this contact was not accompanied by written specifications, because the earliest specifications for the Model 120/121 MPLSM contained in the record are dated April 21, 1970. (Plaintiff's Ex. 10.)

Nonetheless, defendant has established through affidavits that the Postal Service controlled the design of the keyboard on the prototype MPLSMs. These affiants have stated that when Rabinow constructed the model MPLSM, it provided its design and engineering drawings to the Postal Service. (Lieske Aff. at ¶ 2.) When the Postal Service awarded the first MPLSM contract to Burroughs, it provided Burroughs with the Rabinow drawings. (Id. at ¶ 4; France Aff. at ¶ 3.) The Postal Service retained final authority over any design changes from these drawings. (Lieske Aff. at ¶ 4; Hurley Aff. at ¶ 7; France Aff. at ¶ 6.) Postal Service and Burroughs employees worked together closely in constructing the prototype MPLSMs. (France Aff. at ¶¶ 3, 5.) Once the prototype MPLSMs were installed, the Postal Service conducted substantial testing on these units. (Lieske Aff. at ¶ 6; Hurley Aff. at ¶ 7.) The Postal Service eventually accepted all ten prototypes. (Id.)

In 1963 or 1964, the Postal Service prepared drawings of the MPLSM, including the keyboard. (Lieske Aff. at ¶ 3 and Attachment "A"; Hurley Aff. at ¶ 8.) In 1964, the Postal Service awarded Burroughs a contract to mass-produce twenty-six MPLSMs. Affiants have stated that Burroughs was required to follow the Postal Service drawings in constructing these MPLSMs, and that Burroughs could not make any unilateral changes to their design. (Lieske Aff. at ¶ 8; Okun Aff. at 4.) Postal Service employees oversaw the construction of the MPLSMs, tested them upon their completion, and finally approved all of them. (Vogel Aff. at ¶¶ 8–9.)

The first written specifications for the MPLSM are dated April 21, 1970. (Defendant's Ex. 10.) Although the specifications do not explicitly address the configuration of the keyboard, they do indicate that all parts are to conform to Postal Service master drawings, (Id. at ¶ 2.4), and list the operator console, keyboard, key pressure adjustment control, and operator chair in an Index of Assemblies. (Id. at ¶¶ 3.10.1, 3.10.1.6, 3.10.1.6.1, 3.10.1.10.) The specification for the keyboard specifically provided:

· Each console will have two keyboards. Both keyboards shall be binary decimal type arranged for two-hand operation having two groups of five keys, and shall be provided as part of the console by the contractor. All keys shall be unmarked, with a smooth concave surface except the two center keys in the lower group which shall be longer and have more depth to index the thumb of each hand and simplify the touch system of the keyboard. A supplemental or "piggy-back" keyboard mounted above the binary keyboard for direct ZIP code keying will be supplied, installed and connected by the contractor.

(Id. at ¶ 3.1.10.6.) The specifications also contained a section on "Safety Devices," which provided:

The machine shall be furnished with suitable devices as required by the specifications and as shown on the drawings.... All special safety devices ... for protection of operators ... shall be provided as specified herein, or as shown on the drawings.

(Id. at ¶ 3.11.7.12.)

Burroughs continued to manufacture MPLSMs pursuant to contracts with the Postal Service until approximately 1986. (Stotler Aff. at ¶ 7.) During this time, the MPLSM was altered to incorporate both the ZMT and the Expanded Zip Retrofit ("EZR") system, which allowed operators to sort mail by nine digit zip codes.

Plaintiffs agree that Burroughs built the MPLSMs pursuant to Postal Service specifications, that the Postal Service and Burroughs worked closely in constructing the MPLSMs, and that the MPLSMs ultimately conformed to these specifications (Plaintiffs'

Local Rule 12G Statement of Facts ("Plaintiffs' 12G Statement") at ¶¶ 3–5.) Plaintiffs also concede that the ZMT and EZR systems did not change the design of the MPLSMs in any relevant manner. (*Id.* at ¶¶ 12, 14.) They do, however, contend that Burroughs aggressively marketed itself to the Postal Service in order to obtain MPLSM contracts, and participated in the design of the machines. (*Id.* at ¶¶ 4, 6.) Nonetheless, plaintiffs concede that Burroughs could not produce the MPLSMs unless the Postal Service approved their design and they passed Postal Service initial testing. (*Id.* at ¶ 11.)

Plaintiffs' expert, Dr. Rani Lueder, has identified numerous supposed ergonomic design defects in the MPLSM operator station and keyboard. (Plaintiffs' Ex. 12.) He first noted that most aspects of the operator console, such as the operator knee clearance and the keying and envelope slot height, were not adjustable, contrary to ergonomic principles. Furthermore, the keyboard failed to offer arm support. Dr. Lueder also found that the keyboard suffered from poor keyboard feedback, key vibration, inconsistent key force, and poor keyboard design. He also found that MPLSM operators underwent high rates of repetition and received no ergonomic training. Finally, he found that the "sweeping" task that operators performed during their breaks from keying, which consisted of removing mail from the MPLSM sorting bins and further sorting it for ultimate distribution, presented an occupational risk because the height of the envelope bins was not adjustable. Dr. Lueder concluded that all these alleged design defects could contribute to causing MPLSM operators RSIs.

As early as 1963, the Postal Service recognized the "fatigue and monotony" that could be linked to operating the MPLSM. (Defendant's Ex. 32 at 19.) This study also proposed further study of operator chairs with arm rests. (*Id.* at 27.) By the late 1960's, the Postal Service recognized the possible ergonomic impact of the MPLSMs, although it did not seem to recognize the possibility of

RSIs from use of the keyboard. (*See* Defendant's Ex. 30 at 13; Defendant's Ex. 31 at 2–3.)[3] However, a February 12, 1970, agenda for a Mechanization Committee Meeting of the Post Office Department Bureau of Personnel recognized that

> [i]n some cases operators [of MPLSMs] have developed, after years of operating, an arthritic condition in their wrists attributable to sustained suspension of their hands above the keyboard. On doctor's advice they were forced to leave the machine. An arm rest would seem appropriate.

(Defendant's Ex. 36.)

In 1976, after "[i]ncidental reports from operators throughout the country suggested that there might be a high incidence of chronic trauma (or repetitive motion) disorders" resulting from the operation of the MPLSMs, the American Postal Workers and the National Institute for Occupational Safety and Health ("NIOSH") supported a prospective study of this phenomenon. (Defendant's Ex. 47 at 1.) The report, released in 1981, concluded that the available data "strongly suggests a relationship between experience on the machines and the incidence of chronic trauma disorders," and that "[t]he keying portion of the task would appear to be the most likely cause of such disorders." (Defendant's Ex. 47 at 6.)

By 1984, the incidence of RSIs among MPLSM operators became high enough that Congress held hearings on the subject. *Effects of Carpal Tunnel Syndrome and Tendonitis on Postal Employees: Hearings Before the Subcomm. on Postal Personnel and Modernization of the House Committee on Post Office and Civil Service*, 98th Cong., 2d Sess. 98–50 (1984). At these hearings Postal Service officials testified that occupational claims regarding RSIs from MPLSMs did not begin until 1982. *Id.* at 7. They also indicated that they had "problems" with the NIOSH study, because it was "not a very scientific, objective, or impartial type study."

---

**3.** Plaintiffs contend that while the Postal Service conducted "human factors" studies, these studies focused on the performance of operators using the MPLSMs rather than their health and safety. (Plaintiffs' 12G Statement at ¶ 15.) However, it appears clear that the Postal Service did consider human factors from a health and safety perspective, although it does not appear that it contemplated that operators could suffer the types of injuries at issue here.

*Id.* at 8. Nonetheless, by 1987, the Postal Service had developed internal memoranda regarding the correct posture and wrist position for keying on the MPLSM. (Defendant's Ex. 53.)

While the Postal Service's knowledge of RSIs resulting from operating the MPLSMs is not contested by the parties, they do dispute Burroughs' knowledge of these dangers and actions taken to avoid them. Defendant's affiants submit that in preparation for production of MPLSMs pursuant to a 1974 contract, Burroughs suggested the use of an asynchronous keyboard, which would allow the twelve operators at a MPLSM to work at different speeds. (Lazzarotti Aff. at ¶ 9.) This change was ultimately rejected by the Postal Service. (Selin Aff. at ¶ 7; Clarke Aff. at ¶ 7.) However, a 1975 Burroughs document offered by defendant in support of this proposition states that the proposed asynchronous console was primarily directed toward "[i]mprovement in machine and operator accuracy rates" rather than ergonomic concerns. (Defendant's Ex. 55 at 11.) Furthermore, an undated Burroughs "MPLSM Improvement Program" recognizes as a "Problem" that "keyboard not optimum from human factors consideration" and as a "Solution" offers "replac[ing] with operator placeable 10–key keyboard." (Defendant's Ex 54.) The record does not, however, indicate what steps, if any, Burroughs took toward incorporating the operator-placeable ten-key keyboard into the MPLSM design.

Burroughs affiants have also taken the position that they had no knowledge that RSIs could result from the proper use of the MPLSM until the filing of lawsuits in 1986 or 1987, (Okun Aff. at ¶ 12; France Aff. at ¶ 7; Vogel Aff. at ¶ 14; Lazzarotti Aff. at ¶ 18; Ross Aff. at ¶ 6; Selin Aff. at ¶ 8; Clarke Aff. at ¶ 13; Stotler Aff. at ¶ 10; Tartar Aff. at ¶ 10), and that even if they did, Burroughs could not make unilateral changes in the design of the machines, (Okun Aff. at ¶ 8; France Aff. at ¶ 5; Ross Aff. at ¶ 3; Clarke Aff. at ¶ 5; Stotler Aff. at ¶ 3, Tartar Aff. at ¶ 4). Plaintiffs, on the other hand, contend that Burroughs knew more about the possibility of RSIs from the operation of MPLSMs than the Postal Service, and that

Burroughs downplayed these dangers when marketing its products to the Postal Service. (Plaintiff's Rule 12G Statement at ¶¶ 16, 20.) Furthermore, plaintiffs contend that Burroughs could, and on several occasions did, suggest design modifications to the Postal Service, but that it declined to suggest ergonomic adjustments to the MPLSM in order to maintain its contractual relationship with the Postal Service. (*Id.* at ¶¶ 10, 20.) Finally, plaintiffs allege that despite evidence to the contrary, Burroughs attempted to convince the Postal Service that there was no connection between the operation of MPLSMs and RSIs. (*Id.* at ¶ 21.)

## III. ANALYSIS

### A. *Rule 56(f) Motion*

Plaintiffs previously asked the Court to withhold summary judgment in order to allow them to conduct further discovery. Although not specifically mentioned in plaintiffs' papers, Fed.R.Civ.P. 56(f) governs such motions. That provision states:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

■■■ The Third Circuit has made clear that in addressing a Rule 56(f) motion, a district court should consider (1) the particular information sought, (2) how it would preclude summary judgment if obtained, and (3) why it was not obtained earlier. *San Filippo v. Bongiovanni,* 30 F.3d 424, 432 (3d Cir. 1994) (citing *Contractors Assoc. v. City of Philadelphia,* 945 F.2d 1260, 1266 (3d Cir. 1991)), *cert. denied,* —— U.S. ——, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995). While the decision to grant a Rule 56(f) motion lies within the district court's discretion, the motion should be granted " 'almost as a matter of course unless the information is otherwise available to the nonmovant.' " *Id.* at 432–33 (quoting *Contractors Assoc.,* 945 F.2d at 1267).

In this case, plaintiffs requested a Rule 56(f) continuance because they alleged they did not know the identity of defendant's affiants before defendant brought this motion and therefore could not depose them. While defendant contends that plaintiffs have known the identity of these affiants for years, documents submitted by plaintiffs tend to indicate that the identity of many of them was not disclosed until February 1, 1995, only two months before defendants served plaintiffs with the instant motion. Therefore, the Court finds that plaintiffs have met the third prong of the *San Filippo* test, that the information could not have been obtained earlier.

At oral argument, the Court indicated that, on the basis of the current record, it could not see what useful information might be obtained in these depositions or how it would preclude summary judgment. The Court therefore allowed plaintiffs to submit a statement concerning which of defendant's affiants they wished to depose and what information they hoped thereby to obtain.

Following oral argument, the Court granted plaintiffs the supplemental discovery they sought. The additional discovery, however, has only confirmed our initial belief that further depositions would not produce evidence that would preclude summary judgment. Plaintiffs deposed Harold Lieske, Max Okun, William Selin, Arthur Ross, and James Lazzarotti. Although the Court also granted plaintiffs leave to depose Warren Hurley, plaintiffs chose not to do so.

As we explain below, the Court finds that defendant has "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Bailey*, 989 F.2d at 802. The defendants having met this burden, plaintiffs are then required to come forward with "significant, probative evidence." *Id.* Plaintiffs have failed to do so either through initial or supplemental discovery.

Plaintiffs appear to have used the supplemental discovery primarily to attempt to undermine the credibility and memory of defendants' witnesses by quizzing them on thirty to forty year old minutia. Plaintiffs have not, however, produced any "significant, probative evidence" tending to undermine defendants' well-supported assertions that (1) the Postal Service approved reasonably precise specifications, and (2) Burroughs had no more knowledge of risks to MPLSM users than did the Postal Service. Plaintiffs' quiddities have produced no genuine issue as to any material fact.

### B. *The Government Contractor Defense Generally*

Before addressing the specific aspects of the government contractor defense at issue here, a brief discussion of the doctrine as explicated in *Boyle* is in order. In *Boyle*, the decedent was killed when a military helicopter crashed in the ocean during a training exercise. Pursuant to military specifications, the emergency escape hatch was designed to open out rather than in; water pressure thus prevented the decedent from opening the hatch outward once the helicopter had submerged, and he drowned. *See* 487 U.S. at 502–03, 108 S.Ct. at 2513–14.

The decedent's estate sued under a state law design defect theory and obtained a favorable jury verdict. On appeal, the Fourth Circuit reversed, finding that defendant had established a valid "military contractor defense." On certiorari, the Supreme Court affirmed, finding that the state law cause of action was preempted by "federal common law." 487 U.S. at 504, 108 S.Ct. at 2514. The Court found that military contracts lay at the intersection of two "uniquely federal interests": the obligation of the United States under its contracts, and the civil liability of federal officials for actions taken in the course of their duty. 487 U.S. at 504–05, 108 S.Ct. at 2514–15. The Court further found that in the realm of military procurements, these interests were implicated even in suits between private parties, because where military specifications conflicted with products liability law, "either the contractor will decline to manufacture the design specified by the Government, or will raise its price." *Id.* at 507, 108 S.Ct. at 2516.

The Court went on to hold that the presence of these federal interests was merely "a necessary, not a sufficient, condition for

the displacement of state law." *Id.* Instead, state law actions are preempted only where a "significant conflict" exists between the federal interest and state law or the application of state law would "frustrate specific objectives" of a federal scheme. *Id.* The Court found such a conflict between the imposition of state law products liability for military procurements and the "discretionary function" exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a). *Id.* at 511, 108 S.Ct. at 2518. The court then delineated the boundaries of preemption:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not the United States.

487 U.S. at 512, 108 S.Ct. at 2518.[4] The Court found that the first two conditions were necessary to "assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself," and that the third was necessary "because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability." *Id.*

■ In *Carley*, the Third Circuit held that the military contractor defense enunciated in *Boyle* applies to nonmilitary government contracts as well.[5] Therefore, this Court must analyze the current case in light of the test set forth in and the reasoning of *Boyle.*

### C. Design Defect

#### 1. Approving Reasonably Precise Specifications

■ Plaintiffs argue that Burroughs did not construct the MPLSMs according to "reasonably precise specifications" as required by *Boyle.* Plaintiffs contend that Burroughs participated in the design of the MPLSMs, and is therefore not entitled to raise the defense that government specifications forced it to design a defective product. Furthermore, they argue that the MPLSM specifications did not specifically address the ergonomic design features at issue here.

■ However, the Third Circuit has stated clearly that "it is necessary only that the government approve, rather than create, the specifications...." *Carley,* 991 F.2d at 1125 (citing *Koutsoubos v. Boeing Vertol, Div. of Boeing Co.,* 755 F.2d 352, 355 (3d Cir.), *cert. denied,* 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985)). In this case, regardless of Burroughs' participation in the design process, it is evident from the current record that the Postal Service oversaw and participated in this process and eventually approved the MPLSM design, including the keyboards and operator stations. Furthermore, while the approved specifications did not address the specific ergonomic issues

---

4. The second prong of the *Boyle* test is not at issue in this case. Plaintiffs conceded both in their initial opposition and at oral argument that this point was not in dispute.

5. Plaintiffs argue that *Boyle* does not apply to non-military contracts, essentially for the reasons stated in Judge Becker's dissent as to this issue in *Carley. See* 991 F.2d at 1128–33 (Becker, J., concurring and dissenting).

If this were a matter of first impression, we would tend to agree with Judge Becker's reasoning. As Judge Becker stated, while some of the rationale underlying *Boyle* might apply to non-military procurements, "these concerns do not create the same degree of conflict between a federal interest and the operation of state law

that exists in the military context, where product safety must be balanced against national security." *Carley,* 991 F.2d at 1129 (Becker, J., concurring and dissenting). Furthermore, while Judge Becker recognized the majority's argument that the imposition of products liability on nonmilitary government contractors could lead contractors to pass the cost of lawsuits on to the government, he found that this concern was only meaningful in the context of *Boyle* "because of its relation to the acute federal interest in avoiding judicial interference with the design of military equipment." *Id.* at 1131–32.

While the Court thus agrees with Judge Becker's reasoning, we recognize, as do plaintiffs, that we are bound by the majority's holding in *Carley* rather than by Judge Becker's dissent. We will therefore apply the *Boyle* test to this case.

indicated in Dr. Lueder's report, they contained detailed specifications for and drawings of the keyboards and the operator stations. These specifications were certainly "reasonably precise," and their failure to specifically negate every possible ergonomic modification to the design does not change that status.

■ In this regard, the cases cited by plaintiffs regarding "silent" specifications are inapposite. Perhaps the best example of a "silent" specification was given by the Supreme Court in *Boyle:*

> If, for example, the United States contracts for the purchase and installation of an air conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context.

487 U.S. at 509, 108 S.Ct. at 2517. In light of this, other courts have not found that state law is pre-empted where government specifications do not address the alleged defect at issue. *See, e.g., Bailey,* 989 F.2d at 800 (record did not demonstrate that Air Force specifications for fighter jet addressed metallurgic content of bellows canister); *Trevino v. General Dynamics Corp.,* 865 F.2d 1474, 1486 (5th Cir.) (specifications setting forth "only general performance standards" do not preempt design defect claim), *cert. denied,* 493 U.S. 935, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989).

The case at bar differs from those described above. The Postal Service specifications for the MPLSMs address almost every aspect of the machine; they do not merely establish performance standards for the MPLSMs. Instead, plaintiffs' claim is that Burroughs failed to add safety devices to the MPLSM that were neither prohibited nor required by the specifications.

Federal appellate courts have generally concluded that the first condition of *Boyle* is satisfied when the government and the contractor engage in a "continuous back and forth" review process regarding the design of the product. *Tate v. Boeing Helicopters,* 55 F.3d 1150, 1154 (6th Cir.1995); *Harduvel v. General Dynamics Corp.,* 878 F.2d 1311, 1320 (11th Cir.1989), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990); *Koutsoubos,* 755 F.2d at 355. Furthermore, when confronted with situations similar to the one presented here, the circuits have generally held that the contractor has met the first *Boyle* condition. Most notably, in *Stout v. Borg–Warner Corp.,* 933 F.2d 331 (5th Cir.1991), the court addressed Army specifications for an air conditioner that neither required nor prohibited a safety device that plaintiff alleged would have prevented the injuries he suffered when he caught his hand in the air conditioner's condenser fan. The court found that because the Army had approved detailed specifications regarding the condenser fan, the contractor could establish a *Boyle* defense regardless of an express prohibition of the device in the specifications. 933 F.2d at 335–36.

In reaching this conclusion, the *Stout* court followed *Kleemann v. McDonnell Douglas Corp.,* 890 F.2d 698 (4th Cir.1989), *cert. denied,* 495 U.S. 953, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990), and *Harduvel,* both of which further undermine plaintiffs' position. *See* 933 F.2d at 336. In *Kleemann,* the Fourth Circuit rejected a plaintiff's argument that the landing gear on a Navy jet failed to meet Naval specifications "that it withstand normal landing loads without bending, unlocking or causing uncontrolled motion of the aircraft," instead concluding that the landing gear "conform[ed] to the precise quantitative specifications embodied in the totality of documents exchanged between the parties." *Id.* at 702. Similarly, in *Harduvel,* the court was faced with a claim that a crash was caused by defective wiring in an F–16 fighter jet. The Navy had participated in and overseen the development of the electrical system in the F–16, and the first prong of *Boyle* was met because "the contractor incorporated government performance specifications into a de-

sign that the government subsequently reviewed and approved." 878 F.2d at 1320.

 This case fits within the law established by these decisions. The parties agree that a "continuous back and forth" between the Postal Service and Burroughs occurred. Furthermore, like *Stout, Kleemann,* and *Harduvel,* Burroughs constructed the operator's station and keyboard of the MPLSM according to precise design specifications formulated by Burroughs and the Postal Service. Although the specifications did not rule out the ergonomic design features suggested by Dr. Lueder, they did not allow for them either. Furthermore, the record also indicates that Burroughs could not unilaterally add these features to the MPLSM design without Postal Service approval, and that any attempt to do so may have led to rejection of the goods.[6]

Indeed, even those cased cited favorably by plaintiffs do not challenge this conclusion. For example, both *Boyle* and *Trevino* relied in part upon a finding that "reasonably precise specifications" at issue did not apply to the *particular feature* challenged by the plaintiff. *Bailey,* 989 F.2d at 799; *Trevino,* 865 F.2d at 1486. Here, the MPLSM specifications included detailed descriptions and drawings of the operator station and the keyboard, which Burroughs followed.

Plaintiffs have cited one case which truly supports their position, *Anzalone v. Westech Gear Corp.,* 141 N.J. 256, 661 A.2d 796 (1995) (per curiam).[7] In that case, the contractor built a "ram tensioner" for the Navy in accordance with "very detailed and specific" government approved specifications. 141 N.J. at 266, 661 A.2d at 801. However, the specifications "neither required nor prohibited" the safety feature at issue in the case. 141 N.J. at 267, 661 A.2d at 802. On the

basis of this record, the court below concluded that the contractor was not entitled to summary judgment on the government contractor defense. *See* 271 N.J.Super. 522, 638 A.2d 1365 (App.Div.1994).

An equally divided New Jersey Supreme Court affirmed. Justice Handler, concurring for three members of the court, wrote that in order to find federal preemption, a court must find that "the government made an affirmative and definite decision to exclude safety features from the ... ram tensioner and whether, therefore, the omission of any such specifications was an exercise of government discretion." 141 N.J at 271, 661 A.2d at 804. The concurring justices concluded that such a showing was not made in that case because "the absence of either an express prohibition or requirement for 'any type of safety mechanisms or warnings on the ram tensioner' did not evidence a decision by the Navy 'not to adopt safety devices or guards.'" 141 N.J. at 272, 661 A.2d at 804 (quoting 271 N.J.Super. at 537, 638 A.2d at 1373).

Dissenting for three other members of the court, Justice Pollock found that the concurrence's view "stands *Boyle* on its head." 141 N.J. at 275, 661 A.2d at 806. The Navy participated in the production of detailed specifications for the ram tensioner and approved these specifications. Furthermore, the ram tensioner conformed to the specifications, and the government and the contractor had equivalent knowledge regarding the dangers posed by the product. This, Justice Pollock concluded, was all that was necessary to meet *Boyle.* Justice Pollock then went on to distinguish cases where *Boyle* would not apply—such as where the government bought products off the shelf or in accordance with only general performance specifi-

---

6. Plaintiffs have offered evidence to show that Burroughs often suggested design changes in the MPLSM to the Postal Service. (Selin Dep., Plaintiffs' Ex. 17 at 20–21; Lazzarotti Dep, Plaintiffs' Ex. 18 at 14.) While the Court accepts this fact as true, plaintiffs do not offer any evidence to controvert the assertion that any changes to the MPLSM design, regardless of who suggested it, required Postal Service approval before it would be implemented. Defendant's alleged failure to offer ergonomic design changes to the

MPLSM when it knew such changes were necessary goes to the third, rather than the first, element of *Boyle.*

7. Plaintiffs actually relied on the Appellate Division's decision in *Anzalone.* *See* 271 N.J.Super. 522, 638 A.2d 1365 (App.Div.1994). However, two days before oral argument in this matter, an equally divided New Jersey Supreme Court affirmed the Appellate Division in a per curiam opinion.

cations—from the instant case, "involving the government's procurement of military equipment designed by, or in conjunction with, military engineers." 141 N.J. at 277, 661 A.2d at 807.

The Court finds that Justice Pollack's view is more in line with the Third Circuit's holding in *Carley* that the government need only approve, rather than create, the reasonably precise specifications at issue. 991 F.2d at 1125. Otherwise, if *Boyle* were available only when the government imposed specific contractual duties upon the contractor, one of the dangers envisioned by the Supreme Court, that the contractor would pass the potential cost of product liability suits on to the government, would not be abrogated. *See Anzalone*, 141 N.J. at 276, 661 A.2d at 806 (Pollack, J., dissenting) (discussing *Boyle*, 487 U.S. at 511–12, 108 S.Ct. at 2518–19).

We also find the concurrence's opinion in *Anzalone* to be unpersuasive because the New Jersey court did not even address the Fifth Circuit's opinion in *Stout*, and attempted to distinguish *Kleemann* and *Harduvel* by stating that in those cases "the design feature in question . . . was itself considered by a Government officer, and thus falls within the area where the policy of the discretionary function would be frustrated." 141 N.J. at 268, 661 A.2d at 802 (internal quotations omitted). To the extent that this distinction has merit, we find that it does not apply here. The current record shows clearly that the Postal Service carefully considered the design of the MPLSM operator console and keyboard, and did not delegate its discretion to Burroughs. Defendant has therefore met the first condition of the *Boyle* government contractor defense.

*2. The Parties' Relative Knowledge of Risk*

Plaintiffs next contend that even if the MPLSMs conformed to reasonably precise Postal Service specifications, Burroughs knew more about the risks of RSIs associated with the operation of MPLSMs and failed to notify the Postal Service of these risks. Plaintiffs also contend that, despite the Postal Service's knowledge of the danger of RSIs

from MPLSM operation, Burroughs effectively negated the Postal Service's knowledge by convincing it that operation of MPLSMs was unlikely to cause RSIs.

The Court first notes that if either of these allegations were true, defendant's government contractor defense would fail. As the Court held in *Boyle*, the government contractor defense will not succeed if the contractor failed to warn the government about risks associated with the product that were known to the contractor but not to the government. 487 U.S. at 512, 108 S.Ct. at 2518–19. This condition is intended to assure that the contractor does not withhold knowledge of risks in order to maintain the contract while avoiding state law products liability. Therefore, if Burroughs either (1) failed to disclose RSI risks known to it but not to the Postal Service, or (2) attempted to convince the Postal Service that operation of the MPLSMs would not cause RSIs despite its knowledge to the contrary, its government contractor defense would fail.

Defendant has offered evidence to show that the Postal Service had some knowledge of the danger of RSIs in 1970, that the NIOSH study began by 1976, that its results released in 1981 connected MPLSM operation with RSIs, and that by 1984 Congress held hearings on the subject. Defendant has also offered the affidavits of several former Burroughs employees indicating that they were not aware that MPLSMs could cause RSIs until Burroughs began to face lawsuits in 1986 or 1987. (Okun Aff. at ¶ 12; France Aff. at ¶ 7; Vogel Aff. at ¶ 14; Lazzarotti Aff. at ¶ 18; Ross Aff. at ¶ 6; Selin Aff. at ¶ 8; Clarke Aff. at ¶ 13; Stotler Aff. at ¶ 10; Tartar Aff. at ¶ 10.)

Statements that Burroughs was not aware that extended keying could cause RSIs until 1986 or 1987 are simply incredible. Congress held hearings on the subject in 1984, and Dr. Michael Companion, a human factors engineer at Burroughs between 1983 and 1984, offered deposition testimony in a previous case that Burroughs began to explore ergonomically correct keyboard alternatives as early as 1975. (Plaintiff's Ex. 19 at 127.)

While the Court cannot believe that Burroughs knew nothing of RSI risks until 1986 or 1987, Burroughs has offered adequate evidence to establish a prima facie case that its knowledge of these risks did not exceed the knowledge of the Postal Service. For instance, in 1974 Burroughs suggested that the MPLSM utilize an asynchronous keyboard and a "heel of hand" rest, both of which would have cured defects later identified by Dr. Lueder. (*See* Lazzarotti Aff. at ¶ 9 and Attachment "B" at 4–7.) The Postal Service, however, rejected both changes. This evidence tends to show that Burroughs fully disclosed its knowledge of RSI risks to the Postal Service.

Having concluded that defendant has made a prima facie showing of full disclosure, the burden shifts to plaintiffs to offer "significant, probative evidence" of a knowledge differential between Burroughs and the Postal Service. *Bailey*, 989 F.2d at 802. Plaintiffs could accomplish this task in two ways: first, by showing that Burroughs generally "knew more" than the Postal Service regarding the causation or frequency of RSIs due to MPLSM operation; or second, by showing that Burroughs knew of specific design alterations that would reduce the chance of RSIs but failed to disclose those potential alterations to the Postal Service.

Plaintiffs have wholly failed to offer evidence suggesting either of these conclusions. The only evidence offered by plaintiffs regarding Burroughs' knowledge of RSI risks is the deposition testimony of Dr. Companion, which was taken in connection with a previous case. Dr. Companion began working for Burroughs in the spring of 1983, and testified that he became aware of the RSI dangers associated with keyboard operation within a month after he began employment. (Plaintiffs' Ex. 19 at 90.) He also testified that in 1979, Dr. Grandjean, an ergonomic consultant, helped Burroughs develop a keyboard meeting the "highest ergonomic standards in the world," (*id.* at 127–28), and that in the 1980's Burroughs had experimented with ergonomic concepts such as split keyboards and integral palm rests, (*id.* at 158–59.)

While this testimony might tend to show that Burroughs knew something of RSI keyboard risks as early as the 1970's, it does not show either that its knowledge of such risks from the MPLSM keyboard exceeded that of the Postal Service or that it failed to disclose any relevant results of its research to the Postal Service.

In their brief following supplemental discovery, plaintiffs assert that Burroughs "had a duty to inquire of the Post Office what it knew about the potential risk of physical harm to LSM users" (Pl.Brf. at 19). As a legal matter, plaintiffs' argument misstates the third prong of *Boyle*, which requires disclosure where a manufacturer knows more than a purchasing governmental agency (487 U.S. at 512, 108 S.Ct. at 2518–19), but does not require a manufacturer to continually evaluate the purchaser's level of knowledge. And as a factual matter, plaintiffs' argument fails to acknowledge that the Postal Service clearly knew at least as much about such risks as Burroughs did, and probably a good deal more.

A Kansas District Court has reached a similar conclusion in a case involving nearly the same record as is currently before this Court. *Wisner v. Unisys Corp.*, 917 F.Supp. 1501 (D.Kan.1996). There, the Court concluded that,

> the uncontroverted facts establish that the Postal Service, which had exclusive authority over the use of the MPLSMs and the employment and training of its operators, was in a markedly superior position to monitor the effects of use of the machine, and was, in fact, in possession of at least as much information on the dangers of MPLSM use as Burroughs.

917 F.Supp. at 1511. Similarly, a Texas district court, also faced with a record much like ours, concluded that,

> [t]here is no evidence that the defendant had any knowledge of any defect in the design that it failed to warn USPS about. In fact, the evidence shows that the USPS had first hand and superior knowledge of the problems associated with repetitive stress injuries.

*McCoy v. Unisys Corp,* No. H–95–1487 (S.D.Tex. Jan. 16, 1996) (slip op. at 15). We agree with both of these courts that there is simply no evidence that Burroughs had any more knowledge of risks than did the Postal Service. Indeed, the opposite is true: the Postal Service controlled the design of the MPLSMs, used the machines every day, and was in the best position to monitor employee complaints and injuries.

### D. *Failure to Warn*

 Plaintiffs have argued that the government contractor defense does not bar their failure to warn claim. The federal appellate courts that have addressed the issue, however, have all concluded that *Boyle* applies to failure to warn claims. *See Tate,* 55 F.3d at 1156; *In re Hawaii Federal Asbestos Cases,* 960 F.2d 806, 812–13 (9th Cir.1992) ("*Hawaii Asbestos*"); *Stout,* 933 F.2d at 336–37 & n. 2; *In re Joint E. & S. Dist. New York Asbestos Litig.,* 897 F.2d at 629–30 (2d Cir.1990) ("*N.Y. Asbestos*"); *Dorse v. Armstrong World Industries, Inc.,* 716 F.Supp. 589, 590–91. (S.D.Fla.1989). These courts have applied differing tests to failure to warn claims. First, *Hawaii Asbestos, N.Y. Asbestos,* and *Dorse* all require that the specifications at issue affirmatively prohibit warnings before a manufacturer may invoke the government contractor defense. These courts rely on the rationale that "the state-imposed duty of care that is the asserted basis of the contractor's liability (warning of the danger) is not 'precisely contrary' to the duty imposed by the government contract (the duty of manufacture and deliver [sic] cement containing asbestos)." *Dorse,* 716 F.Supp. at 591. *See also Hawaii Asbestos,* 960 F.2d at 812 (manufacturers "could have provided detailed and prominent statements regarding the dangers of asbestos insulation without violating the terms of their procurement contracts or their product specifications"). Therefore, "to establish that *Boyle* displaces any state law duty to warn, [defendant] must show that the applicable federal contract includes warning requirements that significantly conflict with those that might be imposed by state law." *N.Y. Asbestos,* 897 F.2d at 630.

More recently, in *Tate,* the Sixth Circuit rejected this line of cases and held that a state law failure to warn claim would be preempted only where "(1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not." 55 F.3d at 1157. This approach has recently been adopted in *Oliver v. Oshkosh Truck Corp.,* 911 F.Supp. 1161, 1181–82 (E.D.Wis.1996). The *Tate* court made clear that a failure to warn action based on an alleged defect in design could lie even where the contractor had established a *Boyle* defense as to the underlying design defect. *Id.* at 1156. The court stated:

> Warning the government of dangers arising from a specific design—the third condition of *Boyle*—does not encompass or state a failure to warn claim; it simply encourages contractors to provide the government with all the information required to soundly exercise its discretion. "By contrast, tort law duties to warn accomplish an entirely different objective of helping those who use or otherwise come into contact with a product to protect their own safety."

*Id.* (quoting *N.Y. Asbestos,* 897 F.2d at 632).

Plaintiffs urge the Court to follow the first line of cases, while defendant contends that *Tate* should apply. The Court finds that the cases cited by plaintiffs are incompatible with *Carley.* In *Carley,* the Third Circuit made clear that the government contractor defense applies if the government either promulgates *or approves of* reasonably precise specifications. *Hawaii Federal Asbestos, N.Y. Asbestos,* and *Dorse* all require specific warnings or prohibitions of warnings before the defense will apply. *See, e.g., N.Y. Asbestos,* 897 F.2d at 632 ("Stripped to its essentials, the military contractor's defense under *Boyle* is to claim, 'The Government made me do it.' "). Because these cases are incompatible with *Carley,* and because the Court does not believe that the Third Circuit would modify

*Carley* in failure to warn claims, we will not follow this route.[8]

Furthermore, while defendant urges the Court to follow *Tate,* the Court finds that a line of cases from the Fifth Circuit involving the government contractor defense and failure to warn claims is more instructive. First, in *Smith v. Xerox Corp.,* 866 F.2d 135 (5th Cir.1989), the court affirmed a grant of summary judgment on a failure to warn claim without discussion where it also affirmed a grant of summary judgment on the underlying design defect claim. In affirming summary judgment on the design defect claim, the court found that the product at issue conformed to *"reasonably* precise specifications" because the government had supplied specifications regarding the feature at issue and reviewed and approved the final drawings and specifications for the product. 866 F.2d at 138 (emphasis in original).

Next, in *Stout,* the court was again faced with a failure to warn claim premised upon an alleged design defect. In addressing the third prong of *Boyle* as applied to the design defect claim, the court noted that the contractor "only had the duty to warn the government of dangers of which the government had no knowledge." 933 F.2d at 336. In a concluding footnote, the court pointed out that the plaintiff did "not contend that his failure to warn claim can survive the government contractor defense if his design claim does not." *Id.* at 337 n. 2. While the plaintiff did cite *N.Y. Asbestos,* he did so "only to support his argument that [the contractor's] summary judgment evidence did not meet *Boyle* 's third prong as a matter of law." *Id.* The court therefore declined to address any

"alleged conflict" between its *Smith* opinion and the Second Circuit's holding in *N.Y. Asbestos.*

Finally, in *Bailey,* the plaintiff did not challenge the disposition of her failure to warn claim. 989 F.2d at 797. However, in that case, the court made clear that the first element of *Boyle,* reasonably precise specifications, applies only to "the *particular feature* of the product claimed to be defective." *Id.* at 799 (emphasis in original). Furthermore, in distinguishing a design defect claim from a manufacturing defect claim, the court noted that the term "design defect," as used in cases under *Boyle,* in effect refers to "*a defect in the government specifications.*" *Id.* at 801 (emphasis in original).

*Smith, Stout,* and *Bailey* all involved cases where a plaintiff brought a failure to warn claim premised solely on a manufacturer's failure to warn of an alleged design defect claim. Furthermore, in all the cases, the plaintiff also brought an underlying design defect claim. While not stated expressly, these cases may be read as standing for the proposition that, where the manufacturer has established a *Boyle* defense as to the design defect, and the relevant specifications are silent as to warnings, *Boyle* bars the failure to warn claim as well.[9]

 The Court believes that this approach is most consonant with *Carley.* As a general principle of law, a failure to warn is a defect in the design of the product. *See, e.g.,* W. Page Keeton, *Prosser and Keeton on Torts* § 99(2) at 697 (5th ed.1984). *See also*

---

**8.** The Court also notes that all three cases cited above involved failure to warn of the dangers resulting from asbestos exposure. While a distinction between asbestos and other products may be dubious, the Court notes that other jurisdictions have distinguished failure to warn cases on this basis. For instance, the New Jersey Supreme Court, in a case involving asbestos manufacturers, originally concluded that the "state-of-the-art" defense did not apply in strict liability failure to warn claim. *Beshada v. Johns–Manville Prod. Corp.,* 90 N.J. 191, 447 A.2d 539 (1982). The court later reversed itself and limited *Beshada* to asbestos cases. *Feldman v. Lederle Lab.,* 97 N.J. 429, 479 A.2d 374 (1984).

**9.** We do note that in one case the Fifth Circuit recognized "the difficulty a defendant will have

under *Boyle* in establishing an identifiable federal interest or policy in the existence or methods of warning and a significant conflict between that federal interest and the operation of state law." *Garner v. Santoro,* 865 F.2d 629, 636 (5th Cir.1989). However, in support of this position, the court cited *Nicholson v. United Technologies Corp.,* 697 F.Supp. 598, 602–05 (D.Conn.1988), in which the court stated that "[w]hen the government provides or approves specifications of a product which calls for some safeguards but not others, the government contractor is not under a duty to provide every known safety device where it is not called for by the government contract." *Id.* at 605. We do not view these cases as inconsistent with *Smith, Stout,* and *Bailey.*

*Anzalone,* 141 N.J. at 270, 661 A.2d 796 ("We have recognized the parallel between the duty to provide a safe product with adequate warnings and the duty to provide a product that is safely designed"); *Coffman v. Keene Corp.,* 133 N.J. 581, 593–94, 628 A.2d 710 (1993) ("In a failure-to-warn case, the alleged product defect is not a flaw in the structure or design of the product itself. Rather, the defect is the absence of a warning to unsuspecting users that the product can potentially cause injury."). Furthermore, in some jurisdictions, including New Jersey, a failure to warn claim requires proof of the same elements as a design defect claim. *Coffman,* 133 N.J. at 594, 628 A.2d 710. Therefore, a defendant may meet the first prong of *Boyle* on such a claim if it shows that it and the government engaged in a "continuous back and forth" as to the product feature containing the alleged design defect, and that this back and forth resulted in a government-approved specification that did not include warnings. This approach preserves the important point in *Carley* that, "it is necessary only that the government approve, rather than create, the specification." 991 F.2d at 1125.

■ The Court notes that in jurisdictions such as New Jersey, where a failure to warn may simply be based on a design defect, any other approach would effectively eliminate the government contractor defense in failure to warn cases. Where the contractor and the government have equal knowledge regarding an alleged defect, as they must to meet the third prong of *Boyle,* a specification that does not require warnings should be treated as the equivalent of a specification that warnings are not required. Otherwise, the contractor will be liable for the failure to warn of the design defect, and therefore effectively liable for the design defect itself, unless the specifications prohibit warnings. We do not believe that a contractor must, in order to enjoy the protection of *Boyle,* negotiate with the government for a clause that affirmatively excludes warnings. Where the contractor

and government have equal knowledge of the risk of injury, and the government approves a reasonably precise specification that includes no warnings, *Boyle* should apply.[10]

■ We note that a contractor will not always succeed in establishing a *Boyle* defense on a failure to warn claim where it does so on a design defect claim. For example, specifications may encompass both the actual design of the product and warnings, and the product may conform to these specifications while the warnings may not. In such a case, the contractor will have established the second element of *Boyle* as to the design defect claim but not the failure to warn claim. Of course, if the contractor has undisclosed knowledge regarding the risk of injury from the product, it will fail on the third prong of *Boyle* as to both claims. However, in a case such as this, where the contractor and government have equal knowledge regarding the risk of injury and the contractor builds the product in accordance with reasonably precise specifications that do not require warnings, we find that the contractor has established a *Boyle* defense as to both the design defect and the failure to warn claims.

## IV. CONCLUSION

Defendant's motion for summary judgment, based on the government contractor defense, will be granted both on plaintiffs' design defect and failure to warn claims. An appropriate order will enter on even date herewith.

---

10. Although the court did not discuss the issue at length, we do note that in a pre-*Boyle* case, one district court in this circuit followed the rule we promulgate today. *Koutsoubos v. Boeing Vertol, Div. of Boeing Co.,* 553 F.Supp. 340, 344 (E.D.Pa. 1982) (Pollak, J.) (dismissing failure to warn claim as "merely repetitive of plaintiff's assertions concerning design defects."), *aff'd,* 755 F.2d 352 (3d Cir.1985).